Linda HARRE, and her husband, William Harre, Plaintiffs-Appellants,

v.

A.H. ROBINS COMPANY, INC., etc., and Aetna Casualty and Surety Company, etc., Defendants-Appellees.

No. 84–3015.

United States Court of Appeals, Eleventh Circuit.

Jan. 21, 1985.

Stephen Lindsey Gorman, Sidney Matthew, Tallahassee, Fla., for plaintiffs-appellants.

Chris W. Altenbernd, Tampa, Fla., Barbara J. Paulson, Thomas Sloan, San Francisco, Cal., for defendants-appellees.

Before GODBOLD, Chief Judge, HILL, Circuit Judge, and PECK *, Senior Circuit Judge.

JOHN W. PECK, Senior Circuit Judge:

This case is before the court upon an appeal from the order of the district court denying Appellants' motion for relief from judgment and for a new trial. Appellants Linda and William Harre are a married couple who filed suit against A.H. Robins Company ("Robins"), alleging that Linda Harre became sterile as the result of a defective and unreasonably dangerous intrauterine device (IUD) manufactured and sold by Robins. Trial began on March 3, 1983 and lasted twelve days; the jury returned a verdict in favor of defendants. On November 25, 1983, Appellants filed a motion for relief from judgment and for new trial under Fed.R.Civ.P. 60(b)(3) on the

* Honorable John W. Peck, U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

grounds that a defense witness, Dr. Louis Keith, M.D., committed perjury. We reverse the denial of the 60(b)(3) motion and remand for a new trial.

At trial, Appellants alleged that the Dalkon Shield IUD allowed bacteria to ascend within the core of its tailstring from the vagina to the uterus where the bacteria caused infection. This process is described as "wicking." The trial judge stated that wicking was a "principal argument of the whole case" and counsel for Robins agreed that wicking was "the crux of the plaintiffs' case."

During trial, several expert witnesses testified regarding the alleged defect of the Dalkon Shield IUD. Dr. Louis Keith was the last witness for Robins, and his testimony began on March 14 and ended around noon on March 15. On March 14, Dr. Keith testified that, based upon his review of Linda Harre's medical records, he was of the opinion that her pelvic inflammatory disease was caused by chronic cervicitis. When asked whether or not the Dalkon Shield was the cause of the injury, Appellants' counsel objected, and the trial judge ruled that Dr. Keith could not testify on the ultimate issue of causation because a proper foundation had not been established concerning his experience with the Dalkon Shield. On March 15, Dr. Keith testified at length on direct examination regarding his work in the area of transmission of bacteria from the vagina to the uterus. The following discussion occurred:

Q. Now, Doctor, have you done or are you doing any studies under your direction on the Dalkon Shield tailstring itself?

A. Yes, studies are being done under my direction.

Dr. Keith continued his testimony, stating that the general purpose of the experiments was "to gain information on the allegation that had been made by some individuals that the string wicked bacteria." Counsel for Appellants objected on the basis that this line of questioning was outside the scope of the answer to interrogatories as to the subject matter of Dr. Keith's testimony. Counsel for Robins responded that he was laying the foundation on the issue of whether Dr. Keith had done any studies regarding the Dalkon Shield tailstring in response to the ruling on the prior day that Dr. Keith could not testify on the ultimate issue of causation because a proper foundation had not been established. The trial judge overruled the objection, and Dr. Keith continued his testimony regarding wicking experiments. Dr. Keith was asked: "Could you draw a diagram, please, Dr. Keith, of the way in which you conducted these experiments?" In response, he drew illustrations and explained the manner in which the experiments in question were conducted.

The following discussion then occurred:

Q. Now, Dr. Keith, in conducting these experiments, did you have somebody working with you who was a microbiologist?

A. I did.

Q. And did you have someone working with you who was an expert in the use of radioactive labelling of bacteria?

A. Yes. These people were experts.

Dr. Keith further testified that he had acted since 1977 as a consultant and/or expert for attorneys representing Robins. He concluded that, in his opinion, the Dalkon Shield did not contribute to Linda Harre's illness, the Dalkon Shield tailstring did not wick bacteria, and the Dalkon Shield was not unreasonably dangerous for use as an IUD during the time period in question. In closing arguments, counsel for Robins criticized the studies conducted by Appellant's expert, Dr. Tatum:

The best test that has been done on this subject was done under the auspices of Dr. Keith. He testified here yesterday and he described the test that was done by this microbiologist which was a test that more closely duplicated the human situation than any of the laboratory tests done by Dr. Tatum.... Well, Dr. Keith has had that done and he has done it—a series of tests on this and found that not only that the bacteria not [sic] get into the sterile container but radioactivity wouldn't be transported along the string.

On November 1, 1983 (some eight months after the trial of the present case), Dr. Keith testified for Robins in the case of *Dembrowsky v. A.H. Robins Co.*, case No. 764–831, Superior Court of the State of California in and for the City and County of San Francisco. Discovery was sought of Dr. Keith's paperwork and records on the wicking studies he testified to in the trial of the present action. The following is an excerpt from Dr. Keith's deposition:

By Mr. Conklin (Plaintiff's counsel):

Q. Have you done any experimental work on new Dalkon Shield tailstrings?

A. No, other than to look at one I think under the microscope.

Q. You haven't done any wicking experiments?

A. I haven't.

Q. Has somebody under your supervision done some?

A. Not under my supervision. I didn't supervise anybody.

Q. Has somebody at your request done some wicking experiments?

A. I have knowledge of somebody who has done some, but—

Q. Is that—

A. Dr. Eric Brown.

Q. Who is Dr. Eric Brown?

A. Professor of Microbiology at Chicago Medical School.

Q. When did he do these?

A. *Within the last six months.* (Emphasis supplied.)

Q. Are those the same ones that you testified about in Florida?

A. Yes.

Dr. Keith further testified that he had known Dr. Brown for about 15 years and had consulted with him on numerous papers. Dr. Keith also testified that he did not observe the experiments in question, but his knowledge was based upon talking to Dr. Brown and looking at Dr. Brown's laboratory books twice, once a couple of months prior to the deposition. The same counsel represented Robins in both *Harre* and *Dembrowsky.*

After learning of Dr. Keith's testimony in *Dembrowsky,* Appellants filed the Rule 60(b)(3) motion. They alleged that Dr. Keith's deposition testimony in *Dembrowsky* was evidence a fraud had been committed upon the court at trial of the present action in which Dr. Keith had testified that wicking studies had been conducted under his direction. Appellants contended that, but for defense counsel's and Dr. Keith's representation that Dr. Keith had personally conducted such studies, the testimony of Dr. Keith would not have been presented to the jury, and the jury might well have reached a different result. The district court, in denying the motion, found that Appellants failed to show that the conduct of Dr. Keith and defense counsel prevented Appellants from fully and fairly presenting their case. The district court characterized the discrepancies in Dr. Keith's testimony in the two cases as "minor inconsistencies." Further, the court noted that Appellants' counsel could have explored Dr. Keith's involvement in the wicking studies on cross-examination but failed to do so.

▮▮▮ Rule 60(b) provides:

On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order or proceeding for the following reasons ... (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party ....

"To prevail, the movant must establish that the adverse party engaged in fraud or other misconduct, and that this conduct prevented the moving party from fully and fairly presenting his case." *Stridiron v. Stridiron,* 698 F.2d 204, 207 (3d Cir.1983); *See also Rozier v. Ford Motor Co.,* 573 F.2d 1332, 1339 (5th Cir.1978). We find that the record supports Appellants' argument that a material expert witness testified falsely on the ultimate issue in the case, where the defense attorneys knew or should have known of the falsity of the testimony. We disagree with the characterization of the discrepancies as "minor inconsistencies." Further, we do not share the opinion of Robins, as asserted in its brief, that the differences are "incidental" and "trivial" in

nature, nor do we agree that the testimony in question was on a "tangential matter." As noted *supra,* both the trial judge and defense counsel agreed that wicking was the principal issue of the case.

In addition to the issue of the time when Dr. Brown's work was done, intractable conflicts are apparent in Dr. Keith's testimony in this case and his testimony in the *Dembrowsky* deposition:

(1) In this case Dr. Keith testified that "studies are being done *under my direction.*" In *Dembrowsky* he testified that no wicking experiments were done *under his supervision* but that he had knowledge of Dr. Brown's experiments.

(2) Dr. Keith was asked in this case by Robins' counsel to diagram "the way in which *you conducted* these experiments." Dr. Keith responded by drawing illustrations and explaining how the experiments were conducted. But he testified in *Dembrowsky* that he had *done no experiments.*

(3) In the present case, following Dr. Keith's testimony regarding experiments that "you conducted," he was asked whether "in conducting these experiments, did you have somebody working with you who was a microbiologist?" He answered in the affirmative. He testified in *Dembrowsky* that he conducted *no experiments,* so obviously he could not have had a microbiologist working with him in conducting such experiments.

(4) Immediately following he was asked: "And did you have someone working with you who was an expert in the use of radioactive labeling of bacteria?" In context, this too referred to "working with you in conducting such experiments." Dr. Keith answered: "Yes. These people were experts." Again, if, as he testified in *Dembrowsky,* he conducted *no experiments* he could not have had someone working with him who was an expert in radioactive labeling.

(5) In this case Dr. Keith testified in detail describing the manner in which the experiments were conducted, and he drew

illustrations and gave explanations, all in the context of establishing his qualification to express an opinion on wicking by reason of studies having been done by him or under his direction. But in *Dembrowsky* he testified that he *did not observe the experiments* and acquired his knowledge of them only by talking to Dr. Brown and looking at his laboratory books.

Dr. Brown's testimony was exacerbated by the argument of counsel to the jury. Counsel first said that "the best test that has been done was done *"under the auspices* of Dr. Keith." Counsel then stated that Dr. Keith *"has had that* [test] done." He followed this by stating that he [Dr. Keith] has *done it* —a series of tests—leading to a finding that radioactivity would not be transported along the string. These statements of counsel, like Dr. Keith's testimony, squarely conflicted with Dr. Keith's *Dembrowsky* testimony.

We are also unpersuaded by Robins' contention that the inconsistency was merely whether Dr. Keith or Dr. Brown directed these studies and the important issue was what knowledge Dr. Keith had acquired from these tests. Dr. Keith testified at trial on March 15, 1983; his deposition in *Dembrowsky* was taken on November 1, 1983. At that time, he stated that Dr. Brown's studies had been done "within the last six months," and that these were the same studies that were the subject matter of his testimony in March. Thus it is established out of Dr. Keith's own mouth that he testified in the trial of the present action to experiments that had not yet been conducted. The knowledge gained by Dr. Keith could not have been, as Robins urges, the important issue, since when he testified at trial he obviously could not have possessed any knowledge of Dr. Brown's experiment.

Having concluded that Appellants have presented sufficient evidence to support the allegation that Dr. Keith committed perjury,[1] the next inquiry is whether the

---

**1.** We have considered the possibility that Dr. Keith's testimony at trial was truthful and that he committed perjury in his deposition testimony in *Dembrowsky.* After reviewing the record, however, we conclude that the false testimony occurred in the present action.

conduct complained of prevented Appellants from fully and fairly presenting their case. *Rozier, supra* at 1339. Of the numerous expert witnesses for the defense, Dr. Keith was the only one who purportedly had conducted or directed wicking studies. His testimony went to the ultimate issue of causation, and he was the last defense witness in a twelve day trial. We are convinced that, had counsel for Appellants been aware that Dr. Keith had not actually directed, participated in or even observed the experiments he described, it would have made a difference in their approach to the case, and particularly in their cross-examination of Dr. Keith. Therefore, we conclude that Appellants were prejudiced by the discrepancies in Dr. Keith's testimony.

The district court, in denying the Rule 60(b)(3) motion, stated that counsel for Appellants had an adequate opportunity to cross-examine Dr. Keith at trial, but failed to exercise this option. Appellants' cross-examination of Dr. Keith focused upon his review of medical literature and Linda Harre's medical records. Dr. Keith had testified on direct examination, under oath, that wicking studies on the Dalkon Shield tailstring were being conducted under his direction. Counsel for Appellants had objected to this testimony as outside the scope of the answers to interrogatories,[2] but the objection was overruled. Appellants' counsel had no discovery information on these studies and chose not to have Dr. Keith confirm on cross-examination that he had conducted these studies. Realistically, Appellants' counsel expected that Dr. Keith would testify consistently with his testimony on direct examination, and it would not have been in Appellants' best interest to emphasize such testimony on cross-examination. We do not think that failure to discover perjury on cross-examination of an expert witness should be a bar to a Rule 60(b)(3) motion.

Robins states that Appellants' allegations of attorney complicity are baseless. However, in view of the fact that Dr. Keith had acted as a consultant/expert for Robins attorneys since 1977, it becomes obvious that Robins' counsel must have been aware that Dr. Keith's testimony in *Dembrowsky* contradicted his testimony in the trial of this action. Further, we are disturbed by the comments of counsel for Robins in closing arguments and the nature of questions asked in direct examination which tend to support the implication that Dr. Keith was actually involved in the tests.

This court is deeply disturbed by the fact that a material expert witness, with complicity of counsel, would falsely testify on the ultimate issue of causation. Therefore, we hold that the district court abused its discretion in denying Appellants' Rule 60(b)(3) motion. Accordingly, we REVERSE and REMAND for a new trial.[3]

---

**2.** Appellants submitted interrogatories on the subject matter on which each expert was expected to testify. Robins answered in regard to Dr. Keith:

> Dr. Keith practices obstetrics and gynecology in Chicago, Illinois. He is a professor of medicine at Northwestern University and formerly served as medical director of the Illinois Family Planning Association. Dr. Keith is board certified in obstetrics and gynecology and has reviewed the available medical literature on intrauterine devices.

> Based on the foregoing and his experience, training and knowledge, Dr. Keith has formed the following opinions: (1) complications and adverse reactions associated with the Dalkon Shield do not occur at a rate higher than complications and adverse reactions which would be expected to occur with any inert IUD.

**3.** Our holding makes it unnecessary to rule upon Appellants' pending motion to supplement the record.