Mary Virginia OXENDINE, Appellant,

v.

**MERRELL DOW
PHARMACEUTICALS,
INC., Appellee.**

No. 88–335.

District of Columbia Court of Appeals.

Argued Feb. 7, 1989.
Decided Aug. 11, 1989.

Barry J. Nace, with whom Irving R.M. Panzer, Washington, D.C., was on the brief, for appellant.

Walter A. Smith, Jr., with whom Vincent H. Cohen, Alphonso A. Christian II, and William D. Nussbaum, Washington, D.C., were on the brief, for appellee.

Before ROGERS, Chief Judge, and FERREN and BELSON, Associate Judges.

ROGERS, Chief Judge:

Appellant Mary Oxendine appeals the grant of a motion under Super.Ct.Civ.R. 60(b)(6) vacating a 1983 judgment in her favor and granting a new trial.[1] The motions judge found that appellee Merrell Dow Pharmaceuticals, Inc., was entitled to relief although the trial had commenced five years earlier and this court had confirmed appellant's entitlement to judgment three years ago in *Oxendine v. Merrell Dow Pharmaceuticals, Inc.*, 506 A.2d 1100 (D.C.1986) (*Oxendine I*). As his ground for vacating the judgment, the motions judge found that appellant's sole causation witness "grossly misrepresented" his credentials to such an extent that all his testimony on appellant's behalf became suspect. Appellant contends that the motions judge abused his discretion first, because the motion was not filed "within a reasonable time," as mandated by the rule, since appellee had knowledge of the alleged misrepresentations at least three years earlier, and second, because the alleged misrepresentations, which were not about the substantive issues in the case, dealt only peripherally with the expert's credentials and, thus, did not meet the standard of materiality required for vacating a judgment and granting a new trial. Appellant also contends that the findings of deliberate and intentional misrepresentations are unsupported by the record.

We hold that the motions judge did not abuse his discretion in finding that the motion to vacate was timely filed, but that he did err in vacating the judgment and granting a new trial.

I

Eight years ago appellant Mary Oxendine filed suit against appellee claiming that her mother's use of Benedectin, a drug manufactured and produced by appellee for use by pregnant women, had caused appellant's birth defects and deformities. Appellant's sole causation witness at the jury trial, Dr. Alan K. Done, was qualified as an expert witness without objection by appellee.[2] Dr. Done testified that Benedectin caused appellant's birth defects, basing his conclusion upon four types of scientific data which, he opined, taken together supported his conclusion. On May 27, 1983, the jury returned a verdict in favor of appellant, but on September 1, 1983, the trial judge, the Honorable Joseph M. Han-

---

1. This is an interlocutory appeal. D.C.Code § 11–721(d) (1981).

2. Dr. Done's Curriculum Vitae, which runs over twenty pages, shows that he has held numerous medical appointments and professorships, served on the editorial boards of a number of medical publications, and authored or co-authored at least 148 technical papers. He held the position of Special Assistant to the Director for Pediatric Pharmacology, Bureau of Drugs, U.S. Food and Drug Administration, for four years, participated as a speaker at numerous symposia and meetings, and has received many honors, fellowships and certifications in toxicology and pediatrics, including membership in a long list of prestigious medical societies and biographical directories.

non, granted appellee's motion for judgment notwithstanding the verdict. Appellant appealed and this court reversed, ordering that the jury verdict in favor of appellant be reinstated. *Oxendine I*, 506 A.2d at 1114–15. On July 15, 1986, more than three years after the original trial, appellee filed a motion under Rule 60(b)(6) claiming that Dr. Done had testified falsely at trial. Following an evidentiary hearing, Judge Peter H. Wolf[3] granted the motion on February 11, 1988.

Judge Wolf found that Dr. Done knowingly and intentionally gave false testimony at trial in six areas, all of which, the judge conceded, related to Dr. Done's qualifications and not to any substantive issues in the case. Specifically, Judge Wolf found that Dr. Done testified at trial that:

(1) he was presently, on May 3 and May 11, 1983, a member of the Wayne State University Medical School faculty, when, in fact, he had submitted a letter of resignation from Wayne State dated April 24, 1983, to the Dean of the University, which the Dean accepted on April 29, 1983;

(2) he was, at the time of the trial, Chairman of the Formulary Committee at Children's Hospital, a hospital affiliated with the Wayne State Medical School, when, in fact, he had ceased in January 1982 to be Chairman and in March 1982 to be a member of the Committee;

(3) he was presently responsible for a fully-staffed laboratory at Children's Hospital which conducted ongoing research at his request and direction, even though Dr. Done had no laboratory assigned solely to him for the two years prior to his testimony and had conducted no research projects at any laboratory during that time;

(4) he was presently responsible for the care and treatment of patients, even though after his resignation he had no such responsibilities; and

(5) he was a Professor of Pharmacology and Toxicology at the Wayne State Medical School, when no such faculty rank existed and his correct title was Professor of Pediatrics and Pharmacology.

Judge Wolf also found that Dr. Done implied at trial that he was an expert in teratology (the study of birth defects and malformations) and epidemiology (the study of disease incidence and control in a population), but later stated at the evidentiary hearing that he was not an expert in those entire fields.[4]

Regarding the knowledge of counsel for the parties, Judge Wolf found that neither counsel for appellant nor counsel for appellee had actual knowledge, or should have known, about Dr. Done's departure from the Wayne State Medical School prior to or during the trial, and that appellee's counsel did not have a duty to inquire about the circumstances of Dr. Done's departure when they first learned on May 27, 1983, the day of the jury verdict, that he was no longer affiliated with the University. Appellee's counsel did not inquire further about Dr. Done's status until after this court in *Oxendine I* reinstated the jury verdict in March 1986. Appellant's counsel first learned in August 1983 about Dr. Done's resignation in connection with their preparation for Dr. Done's deposition in another case in which he was testifying as an expert.

## II

*Timeliness of Rule 60(b)(6) Motion.* Appellant contends that Judge Wolf abused his discretion in granting a Rule 60(b)(6)[5]

---

3. Judge Hannon recused himself from further proceedings and the case was assigned to Judge Wolf.

4. Judge Wolf cited three other alleged misstatements made by Dr. Done at the Rule 60(b)(6) evidentiary hearing which are not relevant to the issue in the instant appeal regarding the effect of Dr. Done's trial testimony, but bear on

Judge Wolf's estimation of Dr. Done's credibility generally.

5. Super.Ct.Civ.R. 60(b)(6) provides:
    (b) *Mistakes; inadvertence; excusable neglect; newly discovered evidence; fraud, etc.* On motion and upon such terms as are just, the Court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:

motion so long after appellee first learned of Dr. Done's resignation. Appellee responds that it moved for relief very promptly after it had an outstanding adverse judgment from which to seek relief. Judge Wolf agreed with appellee that there was no adverse judgment from which it could seek relief until *Oxendine I* reinstated the jury verdict in March 1986, and found that appellee filed its motion within a reasonable time thereafter in June 1986. We agree.

■ A motion under subsection (6) of Rule 60(b) must be made within a reasonable time, and what is reasonable depends upon the facts in each individual case. *Profitt v. Smith*, 513 A.2d 216, 218 (D.C. 1986). We will not reverse the trial court's decision that the motion was made within a reasonable time absent a clear abuse of discretion. *Id.; Tribble v. American Mut. Ins. Co.*, 277 A.2d 659, 661 (D.C.1971).

■ There is nothing in the record to suggest that appellee was aware of either the pre-trial change in Dr. Done's faculty status before the jury returned a verdict in appellant's favor, or of the reasons for Dr. Done's resignation before the trial judge granted appellee judgment notwithstanding the verdict. Hence, appellee could not have rectified the matter during the trial or grounded its motion for judgment notwithstanding the verdict on a claim that the verdict was obtained by fraud. Appellee learned on May 27, 1983, the date of the jury verdict, that Dr. Done was no longer affiliated with Wayne State University. This information, without more, was insufficient to give rise to a duty on appellee's behalf to conduct further discovery of Dr. Done's credentials after the jury had returned an adverse verdict. People leave universities for many reasons; leaving is not suspect in and of itself. Appellee still had no reason to believe that Dr. Done had not been affiliated with Wayne State at the time of his testimony or that the reasons for his departure were relevant to the out-

come of the trial, as appellee now contends. This circumstance changed somewhat when appellee learned on October 5, 1983, shortly after the trial judge had granted its motion for judgment notwithstanding the verdict, that Dr. Done had ceased to be on the Wayne State faculty prior to his testimony at trial. But even then appellee did not know the reasons for Dr. Done's departure. Since appellee obtained this information after the entry of judgment in its favor, appellee had no further reason to inquire about Dr. Done's credentials, and any motion attacking the verdict would have been superfluous, being simply additional grounds on which appellee could argue that it was entitled to judgment.

■ Accordingly, we hold that Judge Wolf did not err in finding that appellee, upon learning in May 1983 of Dr. Done's change in status, acted timely under the circumstances in filing its Rule 60(b)(6) motion in July 1986, a little more than three months after *Oxendine I* was decided. *See Transit Casualty Co. v. Security Trust Co.*, 441 F.2d 788, 790–91 (5th Cir.), *cert. denied*, 404 U.S. 883, 92 S.Ct. 211, 30 L.Ed.2d 164 (1971); *cf.* 7 MOORE, FEDERAL PRACTICE, § 60.28[2] at 60–316 & n. 20 (1987).

### III

*Vacation of Judgment and Grant of a New Trial.* Judge Wolf concluded that appellee was entitled to the "extraordinary relief [of vacation of a judgment and] a new trial after an appellate decision on the merits and almost five years after the original trial" because Dr. Done's "false testimony about his credentials" was "crucial" and created a "substantial danger that there was an unjust result" at the May 1983 trial. *See* Memorandum Order of February 11, 1986, at 3–5. Our review is limited to determining whether the judge abused his discretion. *Profitt, supra,* 513 A.2d at 218; *Starling v. Jephunneh Lawrence & Assocs.*, 495 A.2d 1157, 1159 (D.C.

---

\* \* \* \* \* \*
(6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time....

1985). Such an abuse exists if the trial court applies an incorrect standard of law or grants relief on the basis of findings of fact that are unsupported by the record. *See* D.C.Code § 17–305 (1981); *Designers of Georgetown, Inc. v. E.C. Keys & Sons,* 436 A.2d 1280, 1281 (D.C.1981); *Robinson v. Jones,* 429 A.2d 1372, 1374 (D.C.1981).

■ Rule 60(b)(6) is intended for unusual and extraordinary situations justifying an exception to the overriding policy of finality. *See Klapprott v. United States,* 335 U.S. 601, 613, 69 S.Ct. 384, 389–90, 93 L.Ed. 1099 (1949); *Profitt, supra,* 513 A.2d at 218 (citing *Railway Express Agency, Inc. v. Hill,* 250 A.2d 923, 925 (D.C.1969); *Union Storage Co. v. Knight,* 400 A.2d 316, 318 (D.C.1979); *Ohio Valley Constr. Co. v. Dew,* 354 A.2d 518, 521 (D.C.1976)). Although relief under Rule 60(b)(6) for "any other reason" is not to be narrowly construed, *see Starling, supra,* 495 A.2d at 1161 (citing *Klapprott, supra,* 335 U.S. at 614, 69 S.Ct. at 390), for a verdict to be vacated on the ground of perjured testimony it must be clear that the perjury was material and not merely incidental to the contested issue. *Coleman v. Chudnow,* 35 A.2d 925, 927 (D.C.1944).[6] To award a new trial, the evidence must in fact have been newly discovered since the trial, its recent discovery cannot be due to a lack of diligence by the movant, and the evidence cannot be merely cumulative or impeaching but must be such as would probably produce a different verdict if a new trial were granted. *Mahallati v. Williams,* 479 A.2d

300, 305 (D.C.1984); *Bradley v. Prince,* 105 A.2d 253, 254–55 (D.C.1954).

The six misstatements found by Judge Wolf to constitute perjury concern Dr. Done's qualifications, not his opinions or methodology. Based on our review of the record before Judge Wolf, only Dr. Done's misrepresentation regarding his faculty status at Wayne State University at the time of trial requires extended discussion and, accordingly, we first dispose of the other five.

■ Five of Dr. Done's statements found by Judge Wolf to be misrepresentations were matters either previously known or readily capable of being learned by appellee in the course of conducting pretrial discovery about Dr. Done's qualifications as an expert. As such, they cannot be considered to have been newly discovered, and the failure to discover them prior to trial shows a lack of diligence by appellee for which it has provided no explanation. *See Chong Moe Dan v. Maryland Casualty Co.,* 93 A.2d 286, 287–88 (D.C.1952); *Great Southwest Fire Ins. Co. v. S.M.A. Inc.,* 59 Md.App. 136, ——, 474 A.2d 950, 957, *cert. denied,* 301 Md. 42, 481 A.2d 801 (1984). Judge Wolf found that Dr. Done had not been a member of the Formulary Committee at Children's Hospital since March 1982, that he had not been Chairman of the Committee since January 1982, that he had not been on the patient wards since December 1982, and that he had not had a laboratory assigned solely to him for two years before the trial and had conducted no research at any other laboratory during

---

**6.** *See also* Judge (now U.S. Supreme Court Justice) Brennan's oft-quoted standard in *Shammas v. Shammas,* 9 N.J. 321, 88 A.2d 204 (1952), for granting postjudgment relief under Rule 60(b)(3) for fraud based on perjured testimony of a party:

... a court may not set aside a final judgment merely because some testimony is perjured.... Perjured testimony that warrants disturbance of a final judgment must be shown by clear, convincing and satisfactory evidence to have been, not false merely, but to have been wilfully and purposely falsely given, and to have been material to the issue tried and not merely cumulative but probably to have controlled the result. Further, a party seeking to be relieved from the judgment

must show that the fact of the falsity of the testimony could not have been discovered by reasonable diligence in time to offset it at the trial or that for other good reason the failure to use diligence is in all the circumstances not a bar to relief.

9 N.J. at 330, 88 A.2d at 208–09 (citations omitted); *accord, Hohensee v. Grier,* 373 F.Supp. 1358, 1365 (M.D.Pa.1974), *aff'd,* 524 F.2d 1403 (3d Cir.1975), *cert. denied,* 426 U.S. 940, 96 S.Ct. 2659, 49 L.Ed.2d 392 (1976). *Cf. Neuman v. Neuman,* 377 A.2d 393, 397 (D.C.1977) (citing *Shammas v. Shammas, supra,* and other cases regarding interest in finality of judgments in denying, on ground of equitable estoppel, the vacation of a divorce decree).

that period. The failure to know Dr. Done's exact title as professor and the areas of his expertise reveals a similar lack of diligence by appellee since the matters could have been learned during discovery. Except for Dr. Done's status at the University at the time of his testimony, which he concealed from both parties during trial, all the misrepresentations were discoverable prior to trial and, consequently, were matters of impeachment which could have been presented to the jury. As such, they cannot form a proper basis for granting the relief requested by appellee. *See Hohensee v. Grier, supra,* 373 F.Supp. at 1365 ("inconceivable" movant could not have controverted alleged perjury at trial).

Moreover, Judge Wolf's finding that in these five instances Dr. Done committed perjury, which requires proof of willfulness, *see* D.C.Code § 22–2511 (1988 Supp.), gives us pause since our reading of the record differs substantially from his, though we do not base our decision on this ground. Dr. Done's testimony regarding his laboratory work is equally consistent with the fact that other professors shared the lab;[7] his testimony about his relation-

ship to patients refers not to his responsibilities for seeing patients on the particular day on which he testified, but to his responsibilities over the year generally;[8] and he explained that he taught toxicology as part of the course of pharmacology.[9] It is hardly unusual for a witness who is on the stand for hours, as was Dr. Done, to slip up, use the wrong verb tense, or misspeak at times. *See Metlyn Realty Corp. v. Esmark, Inc.,* 763 F.2d 826, 833 (7th Cir. 1985).

■ As to Dr. Done's trial testimony that he was on the medical faculty at Wayne State University as of May 1983, the record supports Judge Wolf's finding that *Dr. Done misrepresented his status at the University.* The judge could properly reject Dr. Done's explanation at the Rule 60(b)(6) hearing that at the time of trial he believed he was still on the faculty,[10] and credit instead the testimony of Dean Nadler of Wayne State University who testified that he accepted Dr. Done's resignation by letter dated April 29, 1983, which he sent to Dr. Done, and that Dr. Done was no longer considered a member of the Medical

---

7. Dr. Done testified as follows:

Q. [Defendant's attorney] What percentage of time do you spend doing research?

A. [Dr. Done] Well, I don't myself have to perform most of the research now, that I do in the laboratory, at least, because I have a full crew that does that and a man who directs the laboratory for me.

So I am in charge of it in terms of overlooking it but not having to actually do all with my own hands.

Now, the percentage is again difficult to estimate. It depends on whether you include the writing of it. If you do, that is, oh, I would judge, probably 20 percent in the last year, maybe 15.

At the evidentiary hearing, it was explained that the laboratory which Dr. Done was referring to was shared by all faculty members who had research proposals, and that the person who directed the lab did so for all of them. At another point during the May 1983 trial, Dr. Done testified that he did not have a lab solely for his own use at Children's Hospital.

8. The relevant testimony was:

Q. [Defendant's attorney] When is the last time you were on the ward before today?

A. [Dr. Done] In December.

Q. December of 1982?

A. That's right.

Q. Well, then, would that mean between December 1982 and now, May of 1983, you haven't been responsible for the care and treatment of patients?

A. No, not at all. I was saying that when I am doing that, I am responsible for all the patients on a particular ward, and so that will occupy roughly half of my time while I am attending.

I see patients all through the year in terms either of their being referred to me because it is in my area of special interest or I am asked to consult, if I am teaching students or house officers.

Then I will see them then because almost all of my teaching, in pediatrics at least, is bedside teaching on patients.

I see patients all through the year. Patientwise, that will vary all the way from five or ten percent, some months, up to 50 percent in some months.

9. Dr. Done maintains that the court reporter and not he put the capital letters on pharmacology and toxicology, thus creating the supposed faculty title.

10. Dr. Done testified at the Rule 60(b)(6) hearing that, when he sent his letter of resignation, he was hoping to work out some other arrangement with the University.

School faculty on May 9, 1983, or any date thereafter. *See Flippo Constr. Co. v. Mike Parks Diving Corp.*, 531 A.2d 263, 273 (D.C.1987). Dr. Done requested in his letter of resignation that his termination be effective by the end of April. The record also supports Judge Wolf's finding that counsel for neither party was aware prior to or at trial that Dr. Done's status at the University had changed. Therefore, this evidence was new and not discoverable by appellee by reason of due diligence.

The question remains whether this finding of perjury is material and would have affected the outcome of the trial. The evidence before Judge Wolf reveals that the issue between Dr. Done and the University concerned his loyalty to the University, not his qualifications or expertise, and nothing in the record disputes Dr. Done's qualifications to teach and his significant contributions to his fields of expertise. In view of Dr. Done's extensive resume, the minor portion of Dr. Done's testimony before the jury at issue, and the evidence presented at the Rule 60(b)(6) hearing concerning the circumstances leading to Dr. Done's resignation, we hold that Judge Wolf erred in concluding that Dr. Done's misrepresentation about his faculty status would have affected the outcome of the trial.

Judge Wolf stated in his Memorandum Order, for example, that Dr. Done's

professional witness status led him to shirk his duties at the Wayne State Medical School. That got him fired (gently, by a forced resignation). The true circumstances of that resignation detracted from his professional witness status, and so he covered it up with lies to maintain his purported status.

11. On January 18, 1983, Dr. Done's immediate supervisor, Larry E. Fleischmann, M.D., Professor and Interim Chairman, Department of Pediatrics, Wayne State University, School of Medicine, wrote to Dr. Done:

... regarding [my] concern over your health problems and the difficulties they have caused you in relation to your academic duties.... [they] have prompt[ed] me to inquire as to whether in the opinion of yourself and your physicians, these problems would continue to give you significant difficulty in the area of

Memorandum Order at 4. The judge also stated that Dr. Done's trial testimony "grossly misrepresented his standing in the educational community." *Id.* at 6. Dr. Done admitted that while on the medical faculty at the University he had testified as an expert in numerous trials and that this took him away from the campus. But there was uncontroverted evidence that Wayne State retained a very high opinion of Dr. Done's academic capabilities and professional contributions. Dean Nadler testified that he did not ask for Dr. Done's resignation because of any concern that Dr. Done's academic reputation had deteriorated, but because of other problems, such as Dr. Done's absences from the hospital and his failure to attract external research funding. The Dean explained that the University had to reevaluate and let go faculty members in the early 1980s in response to budget cuts mandated by the State of Michigan as a result of the 1981 recession. Dean Nadler also testified that he had not been concerned with the quality of Dr. Done's teaching; in fact, he was sorry to see Dr. Done leave because Dr. Done had made "significant contributions to pediatrics and toxicology" while at the University. Indeed, in his letter accepting Dr. Done's resignation, Dean Nadler stated that he was willing to discuss with Dr. Done the "possibility of some voluntary affiliation." In addition, although Judge Wolf discredited Dr. Done's testimony in this regard, there was independent evidence in the form of a letter written by Dr. Done's immediate supervisor that Dr. Done had serious health problems which contributed to his not being able to fulfill all his teaching obligations at the University.[11]

the performance of your academic duties, particularly in regard to resident and student teaching assignments in this time when the University's financial situation is causing us to ask more and more of our faculty members in regard to this most inportant [sic] of our duties. If it appears that the problems are of such chronicity that they will pose difficulty ... I would be willing to meet with you to discuss alternative arrangements other than a full-time "full load" arrangement.

Appellee's Exhibit No. 7.

Accordingly, the record does not support the conclusion either that Dr. Done's academic standing had deteriorated to the point that he would not have been qualified as a witness at the original trial or that his credibility would have been so undermined by the circumstances surrounding his resignation from Wayne State University as to affect the jury's verdict. *See Potts v. Catterton,* 82 A.2d 133, 134 (D.C.1951) (where evidence is merely cumulative or impeaching, strong doubt that it would necessarily lead to different result if case were retried).[12] Moreover, it is questionable whether the circumstances surrounding Dr. Done's resignation from Wayne State University would have "probably aid[ed] the trier in his search for truth," the standard for admitting testimony regarding an expert's qualifications, McCORMICK ON EVIDENCE, § 13 at 29–31 (E. Cleary, 2d ed. 1972) (quoted in *Dyas v. United States,* 376 A.2d 827, 832 (D.C.), *cert. denied,* 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977)), or whether appellee would have been permitted to explore such collateral matters at trial. *See Washington v. United States,* 499 A.2d 95, 101 (D.C.1985) (extrinsic evidence inadmissible to impeach a witness on collateral issues). If the evidence had been admitted, appellant, in any event, probably would have been allowed to respond with rehabilitative evidence on Dr. Done's behalf. *See Rease v. United States,* 403 A.2d 322, 327–28 (D.C.1979).

This is not a case involving an imposter, as in *Trapp v. American Trading & Prod. Corp.,* 66 A.D.2d 515, 517, 414 N.Y.S.2d 11, 12 (1979), where the expert, contrary to his testimony, held no degrees, graduate or undergraduate, never completed his freshman year in college, held no licenses in his field of expertise, and, in essence, was not an expert. Neither party disputes that Dr. Done has a distinguished forty-year career in his fields of expertise. Nor is this case like *Herington v. Smith,* 138 Ill.App.3d 28, 92 Ill.Dec. 689, 485 N.E.2d 500 (1985), where the medical expert lied about the university and medical school from which he graduated and the kind of medical license he held. *Id.,* 138 Ill.App.3d at 30–31, 92 Ill.Dec. at 691, 485 N.E.2d at 502.[13] *Oxendine I* settled the question regarding appellant's entitlement to a verdict in her favor on the basis of Dr. Done's testimony; thus, not only is Judge Wolf's conclusion that Dr. Done's testimony at trial was "of doubtful logic" and "a profoundly minority view within the scientific community," Memorandum Order at 5–6, precluded by *Oxendine I,* it is not supported by his factual findings.[14]

**12.** Judge Wolf's finding that Dr. Done's "lies went so much toward enhancing his status as a witness that he reeks of the hired gun who will say anything that money can buy so long as it is glibly consistent with his prior testimony in other cases," Memorandum Order at 4, is troubling. Appellee's expert witnesses at trial also were "hired guns," and, in any event, this is a matter about which appellee cross-examined Dr. Done at trial. The "hired gun" appellation does not advance the necessary analysis.

**13.** All the other cases cited by appellee either have more egregious facts, are not on point, or are otherwise distinguishable. In *Harre v. A.H. Robins Co., Inc.,* 750 F.2d 1501, 1503–04 (11th Cir.1985), contrary to the instant case, the expert witness testified falsely on the ultimate substantive issue in the case. Moreover, *Harre* was criticized in *Metlyn Realty Corp., supra,* 763 F.2d at 832 n. 3, where the circuit court affirmed the denial of a motion under Rule 60(b)(3) for alleged fraud in a tender-offer case. The court criticized *Harre* as "a bit strained," stating that judgments should be reopened only when the party's perjury was "extensive and right at the core of the issues" and not in "less serious cases of alleged fraud." *Id.* The court noted that most courts "are quite shy about reopening judgments on account of perjury even in criminal cases," *id.* (citing *United States v. Krasny,* 607 F.2d 840, 843 (9th Cir.1979), *cert. denied,* 445 U.S. 942, 100 S.Ct. 1337, 63 L.Ed.2d 775 (1980)), and inserted a long discussion of the "good reasons for the stringent limits on reopening a final judgment." *Id.* at 830. The court also noted, "the inevitable shortfalls of the legal system do not call for revisiting judgments.... even if the first proceeding was flawed, there is no assurance that the second proceeding will come closer to the truth." *Id. McKinney v. Boyle,* 404 F.2d 632 (9th Cir.1968), *cert. denied,* 394 U.S. 992, 89 S.Ct. 1481, 22 L.Ed.2d 767 (1969), is not on point because the court in that case merely reversed a denial of a Rule 60(b)(3) motion and remanded on the ground that relief under Rule 60(b)(6) may have been available.

**14.** Both appellee and Judge Wolf refer to the United States District Court judge's decision in *Richardson v. Richardson–Merrell, Inc.,* 649 F.Supp. 799 (D.D.C.1986), *aff'd,* 857 F.2d 823

Accordingly, the judgment is reversed and the case remanded to the motions judge to reinstate the jury verdict as directed in *Oxendine I*.[15]

*Remanded with instructions.*

(D.C.Cir.1988), granting appellee judgment notwithstanding the verdict, contrary to our decision in *Oxendine I.* However, as noted by the District Court judge and the United States Court of Appeals for the District of Columbia Circuit, there was different evidence presented in *Richardson.* 649 F.Supp. at 802; 857 F.2d at 825 n. 9. The record in *Richardson* is not before us, nor was it before Judge Wolf. Hence, it cannot influence our decision.

15. Appellee also asks this court to review the admissibility of Dr. Done's testimony at the May

1983 trial even though appellee never raised this issue at either the 1983 trial or the 1987 Rule 60(b)(6) evidentiary hearing, or on the previous appeal. We decline to do so. This court addressed the merits in appellant's direct appeal, *see Oxendine I*, and appellee has presented no grounds on which to be entitled to raise this issue in this interlocutory appeal. *Cf. Chase v. Gilbert*, 499 A.2d 1203, 1209 (D.C.1985); *Miller v. Avirom*, 127 U.S.App.D.C. 367, 369–71, 384 F.2d 319, 322–23 (1967).