DALTON *v.* GRAND TRUNK WESTERN RAILROAD COMPANY.

BARNARD *v.* SAME.

1. EVIDENCE—NEGATIVE TESTIMONY.

Testimony is not to be rejected merely because it is negative, the only requirement being that the witness was so situated that in the ordinary course of events he would have heard or seen the fact had it occurred.

2. SAME—NEGATIVE TESTIMONY—AFFIRMATIVE TESTIMONY.

The probative value of negative testimony and the probative value of affirmative testimony stand on the same footing, where each has a proper foundation.

3. SAME—NEGATIVE TESTIMONY.

The burden upon the party who relies upon negative testimony is that of showing the circumstances pertaining to the nonobservance, the witness' activities at the time, the focus of his attention, his acuity or sensitivity to the occurrence involved, his geographical location, the condition of his faculties and all physical and mental attributes bearing upon his alertness or attentiveness at the time.

4. TRIAL—WEIGHT OF EVIDENCE—CREDIBILITY OF WITNESSES—QUESTION FOR JURY.

Ordinarily, the weight to be accorded the testimony of a witness, his credibility, whether or not his testimony is affirmative and convincing, rests with the jury.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 20 Am Jur, Evidence § 254.
[2] 20 Am Jur, Evidence § 1186.
[3] 20 Am Jur, Evidence § 139.
[4] 53 Am Jur, Trial § 181.
[5] 38 Am Jur, Negligence § 344 *et seq.*

5. Same—Judges—Jury—Questions of Fact.
A trial judge has to say whether any facts have been established by evidence from which negligence may be reasonably inferred and the jurors have to say whether, from those facts, when submitted to them, negligence ought to be inferred.

6. Railroads—Crossing Accident—Negative Testimony—Signals.
Negative testimony of plaintiffs' witnesses as to whether or not railroad locomotive's whistle was blown as required by statute *held*, without probative value in actions against railroad company for damages arising from crossing accident in which 5 persons were killed and another injured (CLS 1956, § 466.13).

Appeal from Oakland; Doty (Frank L.), J. Submitted October 8, 1957. (Docket Nos. 3, 4, Calendar Nos. 46,757, 46,758.) Decided December 24, 1957.

Case by the Estate of Roy Dalton, by Norman R. Barnard, administrator, against the Grand Trunk Western Railroad Company, a corporation, for damages resulting from death when automobile was struck by train. Similar action by Douglas Dalton, a minor by guardian, injured in the collision. Cases consolidated for trial and appeal. Directed verdicts and judgments for defendant. Plaintiffs appeal. Affirmed.

*Anthony Renne,* for plaintiffs.

*H. V. Spike* and *F. B. Henderson* (*Patterson & Patterson* and *Barrett,* of counsel), for defendant.

Smith, J. This case involves a railroad crossing accident. A family consisting of husband, Roy Dalton, wife, 3 girls, and a boy was almost completely wiped out, only the son, Douglas Dalton, surviving. Suits were brought by the estate of Roy Dalton, deceased, and Douglas Dalton, against defendant Grand Trunk Western Railroad Company, which suits, by stipulation, were consolidated for trial

The accident occurred a few miles east of the city of Durand. Here the County Line road intersects the right-of-way of defendant. The crossing is unprotected, save for a crossarm marker. Immediately north of the tracks and west of the County Line road is an embankment some 5 to 7 feet in height which interferes, to some extent, with the westerly vision of a motorist traveling, as were the Daltons, in a southerly direction on the County Line road when the motorist is close thereto. Such a motorist's view to the west, from which direction the train approached, is partially obstructed some 200 feet north of the crossing by the farm home and buildings of the Thomas family, south of which there is a relatively clear space some 150 feet or more in length, at which point the above-described embankment commences to interfere with clear vision.

The Dalton car was being driven, as noted, in a southerly direction on the County Line road about 4 p.m. on the afternoon of November 29, 1953. It was a cloudy, overcast day, with snow at intervals. The car passed the Thomas home at a speed of about 20 miles per hour and proceeded, without stopping, onto the tracks where it was struck. The results of the collision, in terms of human life, we have described.

The cases were tried to a jury. At the close of plaintiffs' proofs the court directed verdicts for the defendant. The cases are before us upon general appeals.

The crux of the primary issue before us relates to the negligence of the defendant railroad. Appellants rely upon CLS 1956, § 466.13 (Stat Ann 1955 Cum Supp § 22.272), requiring, in part, that:

"A bell of at least 30 pounds weight, and a steam or air whistle or siren, shall be placed on each locomotive engine, and said whistle or siren shall be twice sharply sounded at least 40 rods before the crossing is reached, and after the sounding of the whistle or

siren, the bell shall be rung continuously, until the crossing is passed, under a penalty of $100.00 for every neglect."

Appellants assert that there was testimony from which a jury might have found that the statutory timely warning by whistle was not given. They also point out that there was a complete lack of testimony that the bell was rung as required, but the record discloses that no questions were asked of any witness by either party on this point. Since the primary issue argued to us relates to the sounding of the whistle, we have examined the evidence with respect thereto in detail.

Upon the afternoon in question, which was a Sunday, Mr. and Mrs. Ralph Thomas (whose home, as we have noted, was some 200 or more feet north of the crossing) "had some friends and relatives in for a Sunday-get-together," Mrs. Thomas' sister and husband, and her husband's 2 brothers. It was during this occasion that the tragedy at the nearby intersection occurred. Mr. Ralph Thomas describes the sequence of events from his point of view in these words:

"Around 4 or 4:10 that afternoon there was a car and train accident. Immediately prior to the accident I was sitting in my home visiting and the first I knew about it, my brother said something about, 'I wonder if that car made it,' and then I heard the train whistle blowing and then we heard a crash. I recognized the train whistle was blowing as he spoke and then we heard a crash right away. My brother made the remark, 'I wonder if that car made it' and I believe my brother was sitting in a position where he could look out the window. I did not notice any car, but I heard the whistle and the crash. To my best recollection, it was probably just a few seconds before the time when I heard the whistle blowing and the crash. It wasn't very long. I couldn't say just exactly. When my brother said, 'I wonder if

that car made it' I got up and started towards the front door, I did not get to the front door. The whistle was blowing when he spoke to me. I don't know how long it was blowing before that or whether it was or wasn't blowing. I didn't hear it until he spoke. He spoke and I got to my feet and started for the door. The door would not be over 10 feet from me."

The witnesses testifying for plaintiffs with respect to the sounding of the whistle were the Thomases, Mr. and Mrs. Ralph Thomas, and his brother, Lee Thomas. Mrs. Thomas stated that she heard the whistle blowing "maybe seconds before the crash. * * * Not even a minute, I wouldn't say. I wouldn't say for sure just how many seconds." The strongest possible interpretation of this testimony for plaintiffs (since she uses the plural of the word "second") is that she heard the whistle blowing 2 seconds before the crash and that, before this, she did not hear it. Her husband says he heard it "from the time my brother spoke to me about the car. It might have blown before that, it might not. I couldn't tell you." Similarly plaintiffs' best position on this testimony is that the witness did not hear a whistle until immediately prior to the crash, practically simultaneously therewith. The final witness is Ralph's brother and guest, Lee Thomas. He testified as follows:

"I saw it when it was there I watched the car from the time I looked out the window of my brother's house, until it reached a point approximately on the railroad track. The car did not stop at any time. It kept right on going until it was hit. The car was going about 20 m.p.h., somewheres in there.

"*Q.* Now, I understand that your hearing isn't 100% correct, is that right?

"*A.* That's right.

"*Q.* And do you now remember hearing the whistle at any time?

"*A.* I heard it blow just before the accident.

"*Q.* You remember hearing it just before the accident?

"*A.* That's right.

"*Q.* Whether it blew before that you wouldn't know?

"*A.* I wouldn't know. I never heard it.

"*Q.* And you are not attempting to tell us whether or not the whistle blew before you heard it, are you?

"*A.* I couldn't have heard it down the road a mile. I couldn't have heard it there.

"*Q.* It could have blown back 100 feet and you not remembered hearing it?

"*A.* I would have heard it blowing there. I was not listening for the whistle, but I would have heard it, if it blew. I did not hear the crash because I was turned that way speaking to my brother. I heard the train but did not recognize the different sound outside of the train."

Likewise, the interpretation of this testimony most helpful to plaintiffs is that the whistle blew "just before" the accident, but prior thereto the witness did not hear it.

What we have, then, in substance, upon favorable view, is the negative testimony that plaintiffs' witnesses did not hear the whistle until immediately prior to the collision. We do not, of course, reject testimony merely because it is negative. As Wigmore points out in his treatise on Evidence (3d ed), vol 2, § 664, p 778, "There is no inherent weakness in this kind of knowledge. It rests on the same data of the senses. * * * The only requirement is that the witness should have been so situated that (these italics are the author's) *in the ordinary course of events he would have heard* or seen the fact had it occurred."

Testimony that a certain event did not occur may range all the way from that of the nuclear physicist who testifies that in a certain experiment fusion did not take place, to that of the village drunk who, at the moment of occurrence, was in his cups and not observing much of anything. The ancient rule that positive testimony is to be accorded more weight than negative ("It is a rule of law that positive or direct testimony is of greater value than mere negative testimony." *McGowan* v. *Wilmington & Philadelphia Traction Co.*, 5 Boyce [28 Delaware] 281, 287 [92 A 1015]) is avoided, in the hard cases, when necessary to change the result without changing the rule, in the law's time-honored way, simply by calling it something else not forbidden by the rule. Thus the testimony of the physicist becomes (by reason of his attention and acuity) "positive." *Lonis* v. *Lake Shore & Michigan Southern R. Co.*, 111 Mich 458.

Such fencing with words casts no light on the problem. Better, by far, frankly to concede, as someone once said, that silence is as much a fact as sound. "Modern psychology," Wigmore, *supra,* p 782, put it, "sneers at the law's crude assumption that the complexities of human perception can be handled by some rules of thumb about negative testimony or the like." Under this analysis the probative value of negative testimony and the probative value of affirmative testimony, each having a proper foundation, stand on the same footing. Such negative testimony is not automatically inferior in probative value merely because it relates to nonoccurrence. The problem involved in its use, however, arises because from it 2 conflicting inferences are possible, (a) that the event did not occur, or (b) that it did occur but that the witness, for certain reasons, did not hear it. The mere fact of nonhearing, standing alone, ordinarily has no probative value whatever as to the occurrence, or nonoccurrence, of the event. Many of

us did not hear the bombs falling on Pearl Harbor. Thus the burden upon him who relies upon negative testimony is marked: he must show the circumstances pertaining to the nonobservance, the witness' activities at the time, the focus of his attention, his acuity or sensitivity to the occurrence involved, his geographical location, the condition of his faculties, in short, all those physical and mental attributes bearing upon his alertness or attentiveness at the time. We expressed this principle in *Lambert* v. *Minneapolis, St. Paul & Sault Ste. Marie R. Co.,* 209 Mich 107, 113, in which we held, per Fellows, J.:

"This analysis of the cases shows that in those relied upon by the plaintiff it was held that where the witnesses testified that they were listening, their attention was upon the train, its coming was upon their minds and they were paying heed to it, that then their testimony makes a case for the jury. This upon the theory that if they were listening, giving the train heed and attention, the probabilities are they would have heard the signals if they had been given."

Ordinarily, of course, the weight to be accorded the testimony of a witness, his credibility, whether or not his testimony is affirmative and convincing, rests with the jury. This is not a matter of ritual, of incantation only. We are dealing with a constitutional right, zealously to be protected in form and substance, to be preserved alike from procedural erosion and substantive avoidance. A court shall not robe itself in the habiliments of a jury. This does not, however, require a court's abdication of its historic function. Lord Cairns' apt expression,* quoted by this Court in *Carver* v. *Detroit & Saline Plank Road Co.,* 61 Mich 584, 592, puts the principle in few words:

---

* From *Metropolitan R. Co.* v. *Jackson,* 3 LR App Cas 193, 197 (47 LJQB 303, 305).—Reporter.

" 'The judge has a certain duty to perform, and the jury another and different duty. The judge has to say whether any facts have been established by evidence from which negligence may be reasonably inferred; the jurors have to say whether, from those facts, when submitted to them, negligence ought to be inferred.' "

See, also, *Lake Shore & Michigan Southern R. Co. v. Miller,* 25 Mich 274, 294, 295,[*] where it was said with respect to the proper scope of the jury function:

"Juries may act upon the question of diligence when there is any evidence tending to prove it. If there be no such evidence, there is nothing before them upon which they can find such diligence. And the question of the relevancy of evidence and its tendency to prove diligence, or whether there be any such evidence, is not a question for the jury, but a question of law for the court; and it must be decided by the court, and not by the jury."

What, then, of the application of these settled principles of law to the case before us? We had 3 witnesses who testified for plaintiffs. The favorable view, to plaintiffs, of the testimony of the hostess at the family get-together, is no more than that she did not hear the whistle blow, save just before the crash. As to what she was doing at the time, where she was, or upon what her attention was directed, the record is completely silent. Such testimony on the issue is without probative value. Her husband, likewise, heard no statutory signal blown, but, as he says, "I do not pay much attention to train whistles. I am used to them." The testimony of his brother, Lee, was to the same effect, that is, he heard no signal save just before the crash. He, however, the record discloses, was hard of hearing and did not hear the crash itself.

---

[*] As to the imputed negligence issue in this case, overruled by *Bricker* v. *Green,* 313 Mich 218 (163 ALR 697).

Upon the facts there was nothing to go to the jury. As we said in *Buchthal* v. *New York Central R. Co.*, 334 Mich 556, 564:

"The testimony that a witness did not hear signals cannot be considered unless it is shown affirmatively that the witness was in a position to hear signals if given and that she was paying attention when it is claimed the signals were being given."

See, also, *Williams* v. *Grand Trunk Western R. Co.*, 344 Mich 84, 88, wherein it was held:

"In order to have a jury question in such instances the cases generally require either positive testimony that the signals were not working or testimony that the signals were not seen or heard accompanied by evidence that a certain degree of attention and care was being exercised toward the possible area of danger. Mere testimony that the signals were not *heard* or *seen* does not, in and of itself, present an issue of fact as to whether or not they were operating."

There is no need, upon this view of the facts and the law, to discuss the issue of contributory negligence of deceased Roy Dalton.

The case is affirmed. Costs to appellee.

DETHMERS, C. J., and SHARPE, EDWARDS, VOELKER, KELLY, CARR, and BLACK, JJ., concurred.