**Judith Ann HUMMER, Appellant,**

v.

**Martin D. LEVIN, D.M.D.,**

and

**Drs. Levin, Cohen, Goodman & Siegel, P.A., Appellees.**

No. 93–CV–721.

District of Columbia Court of Appeals.

Argued Oct. 24, 1994.

Decided March 21, 1996.

Leonard P. Buscemi, Arlington, VA, for appellant.

Matthew J. Kastantin, Washington, DC, for appellees.

Before WAGNER, Chief Judge, and KING, Associate Judge, and GALLAGHER, Senior Judge.

WAGNER, Chief Judge:

This case arises out of a claim of dental malpractice filed by appellant, Judith Ann Hummer, against appellees, Drs. Levin, Cohen, Goodman & Siegel, P.A., a professional corporation, for damages resulting from injuries sustained during a procedure performed by Dr. Martin D. Levin in the course of his employment with the corporation. The case was tried twice by a jury. The first trial resulted in a jury verdict for Hummer in the amount of $4,000,000. However, the trial court granted appellees' motion for new trial on the ground that its ruling excluding certain evidence proffered by appellees prejudiced their rights. In the second trial, the jury returned a verdict for Hummer in the amount of $3,290,000, or $710,000 less than the judgment in the first trial. On appeal, Ms. Hummer challenges the order of the trial court setting aside the first verdict and judgment and granting a new trial, and she seeks to have the original verdict reinstated. We hold that the trial court abused its discretion in ordering a new trial and reverse and remand for reinstatement of the original verdict.

## I.

On November 9, 1987, Ms. Hummer went to Dr. Levin, an endodontist, to have a root canal performed. Since the procedure is quite painful, Dr. Levin anesthetized the area with lidocaine by using a technique called a mandibular block.[1] When the effect of the lidocaine had worn off, Ms. Hummer discovered that her tongue and jaw were injured severely. As a result of the injection, Ms. Hummer, who was 34 years old at the time, sustained extensive nerve damage to her tongue and mouth which caused her tongue muscle to function improperly and which permanently impaired her speech.[2] Ms. Hummer now attends Gallaudet University to learn American Sign Language. She communicates through note writing, electronic devices, and interpreters. She drools uncontrollably and has difficulty swallowing, tasting, chewing and sipping. She cannot perform simple dental hygiene, or undergo general dental care without full general anesthesia in a hospital. She has severe, chronic face and mouth pain, which distorts her facial expressions. She has frequent episodes of severe, stabbing pain in her tongue brought on by swallowing, coughing, or laughing.

Ms. Hummer testified that when Dr. Levin performed the mandibular block, he rapidly inserted the long needle into the tissue on the inner side of her right jaw joint, which caused her such intense pain that she involuntarily lunged forward into an upright posi-

1. According to the testimony of Dr. Basil Schiff, a mandibular block is executed with a needle, attached to a syringe containing a carpule of anesthetic which is slowly inserted into a particular area. When the needle has reached the desired depth, the anesthetic is deposited slowly into the tissue by pushing down on a syringe handle.

2. According to the evidence, Ms. Hummer sustained injuries to as many as four cranial nerves: (1) the 7th, which serves the function of taste; (2) the hypoglossal, or 12th cranial nerve, which controls the movement of the tongue; (3) the lingual nerve, which is involved with the nerve which gives sensation to the tongue; and (4) the glossopharyngeal, or 9th cranial nerve, which controls muscle coordination in the back of the tongue and taste on the posteria-third of the tongue.

tion. According to Ms. Hummer, Dr. Levin pushed her back into the chair, using the hand that was holding the syringe. She said that Dr. Levin immediately plunged the syringe handle down and injected the first carpule of lidocaine into her jaw. While the needle was still implanted in her mouth, according to Ms. Hummer, Dr. Levin removed the spent carpule, inserted a second into the syringe, and administered another injection. According to Ms. Hummer's experts, it was the manner in which Dr. Levin gave the injection which constituted malpractice. Specifically, the experts testified that Dr. Levin breached the standard of care by (1) injecting the needle too rapidly at the risk of causing traumatic injury, (2) failing to withdraw the needle when Ms. Hummer reacted to the shock and the burning sensation on her tongue,[3] and (3) changing the carpule with the needle still inserted in the patient's tissue. The experts testified that these negligent acts or omissions were the proximate cause of the injuries which Ms. Hummer sustained.

Ms. Hummer testified that a dental assistant was present before and during the injection. She specifically remembered that the dental assistant was on her left and that after she reacted to the injection, Dr. Levin was on her right. She also remembered that after she reacted to the injection, the assistant passed the second carpule to Dr. Levin, right in front of her. Dr. Levin testified that he had no recollection of administering the injection to Ms. Hummer. However, he testified that his records have the notation "L2," which indicates that he administered two carpules of lidocaine. He testified that he never would continue an injection over a patient's protests of pain. He further stated that he never would change a carpule with the needle still in the patient's mouth. On the contrary, he stated that he always extracts the syringe before inserting a new carpule and gives a second injection only after the first has taken effect. Dr. Levin testified that if Ms. Hum-

mer had reacted to the injection as she described, he would have remembered it because it would have been so unusual.

Dr. Levin testified that he had no recollection of whether anyone else was in the room, but that an assistant is usually present during such a procedure, although one is not required to be present. Dr. Levin testified that when assistants are assisting him, they must watch because they hand him the instruments. He denied that any assistant would turn her back during the procedure to prepare trays, take phone calls, or make entries on the patient's chart. He said only one of three assistants would have been present, Prabhjot Gabri, Renee Strong, or Margaret Mothersole.[4]

Appellees sought to call all three assistants to testify at the first trial to provide (1) "negative evidence," *i.e.,* evidence that whoever was present at the time of the injection would have been close enough to Dr. Levin and Ms. Hummer to have heard or seen the alleged incident, but did not hear or see it and (2) "habit evidence"—that the witnesses were familiar with Dr. Levin's general injection practices. The trial court (Judge Salzman) sustained Ms. Hummer's objection to Ms. Gabri's testimony concerning how Dr. Levin administered injections generally or by habit.[5] The court permitted Gabri to testify in response to a lengthy, hypothetical question on her "negative knowledge" of the incident. The question posed was as follows:

By MR. KASTANTIN:

Q: I want you to assume that you're in the room assisting Dr. Levin during the course of a mandibular block injection to Ms. Hummer.

I want you to assume that just as Dr. Levin is about to start the injection, Ms. Hummer raises her arms to stop him and proceeds to relate a story about a prior problem she had a week before with Dr. Savoia.

---

**3.** Dr. Paladino testified that Dr. Levin apparently touched or impaled the lingual nerve, which he stated can happen because the nerve cannot be seen. However, he testified that Dr. Levin's response to the patient's reaction breached the standard of care.

**4.** Dr. Levin thought that there was only a slight possibility that Ms. Mothersole was present because she was not performing "dental assisting" at that point.

**5.** The propriety of the court's ruling on habit evidence is not raised as an issue on appeal.

I want you to assume that during the course of the injection, Dr. Levin administers the injection rapidly or quickly, and that Ms. Hummer jumps or sits straight up in her chair in pain.

I want you to assume that Dr. Levin does not withdraw the needle but instead forces her back down into the chair and finishes the injection.

I want you to assume that he did not remove the needle from her mouth and with a needle still in the tissue, I want you to assume that you then handed him a second carpule of anesthetic which he then changed in the syringe with the needle still in the patient's mouth. He then proceeded to perform a root canal.

Would you remember such an event if it occurred?

MR. BUSCEMI: Objection, Your Honor.

WITNESS: Yes, I would.

THE COURT: I will allow it, I will permit it. If that's the question, I will say that she would remember such an event if it occurred.

MR. KASTANTIN: Do you recall any such event?

WITNESS: No.

Appellees sought to elicit similar testimony from Renee Strong by asking her virtually the same hypothetical question.[6] The court sustained Ms. Hummer's objection stating as its grounds:

[T]he issue here is one of negligence. To use an analogy, it's simply if one is driving a car normally, one doesn't have an accident. One may be negligent on one occa-

sion and have an accident. That one did not see another person driving negligent[ly] in the past, is not evidence that one didn't do it in this case and the objection is well taken.

Strong had testified that whenever she assisted Dr. Levin with a mandibular block, she would remain throughout and that her duties included placing the anesthetic capsule into the syringe and passing it to Dr. Levin. However, Strong also testified that there were occasions when Dr. Levin loaded the syringe himself. Although she recalled Ms. Hummer as a patient, she could not recall whether she assisted Dr. Levin when Hummer was treated. Appellees proffered that had Strong been allowed to respond to the hypothetical question, she would have given the same testimony as Gabri, *i.e.,* that she recalled no such incident, and if she had been present and the event actually had occurred, she would have remembered it. Appellees also proffered that Margaret Mothersole would have responded in the same way.

The trial court granted appellees' motion for a new trial because it concluded that it had erred in excluding the proffered testimony of the dentist's assistants who would have provided negative evidence. Appellant Hummer argues that the trial court erred in granting a new trial on the basis of the claimed legal error because its initial evidentiary ruling excluding the evidence was correct.

## II.

This court's review of the trial court's order granting a new trial is limited

---

**6.** The question posed to Ms. Strong was as follows:

Q: I want you to assume that you are the dental assistant in the operatory room with Dr. Levin at the time he is about to give the Plaintiff, Ms. Hummer, a mandibular block injection.

I want you to assume that just before he starts the injections, Ms. Hummer puts up her hands and tells the doctor to stop, and then relates to him an incident where she has some trauma to her lingual nerve from Dr. Savoia about a week before.

I want you to assume that after that is related, Dr. Levin then proceeds with the injection and he injects the needle in a fast, rapid, harsh fashion.

I want you to assume at that point the Plaintiff then sits straight up in the chair and that Dr. Levin pushes her back down without withdrawing the needle from her mouth, finishes the injection.

I want you to assume that you then hand him a carpule across the front of her face, and the doctor takes the carpule and with the needle and the syringe still in her mouth, proceeds to change, take out the old carpule, put the new one back in and then complete that injection.

I want you to further assume that when its over, he then proceeds and performs a root canal.

If events such as that occurred, would you have remembered them?

to whether the ruling amounted to an abuse of discretion. *Oxendine v. Merrell Dow Pharms., Inc.,* 563 A.2d 330, 333 (D.C.1989) (citations omitted) (*Oxendine II*). Where the court denies the motion and sustains the jury's verdict, the scope of review is a narrow one. *Oxendine v. Merrell Dow Pharms., Inc.,* 506 A.2d 1100, 1111 (D.C.1986) (*Oxendine I*). Greater scrutiny is required where the trial court, in granting a motion for new trial, sets aside a jury's verdict. *Lyons v. Barrazotto,* 667 A.2d 314, 324 (D.C.1995); *Oxendine I,* 506 A.2d at 1111; *Bell v. Westinghouse Elec. Corp.,* 483 A.2d 324, 327 n. 2 (D.C.1984). In *Bell,* we observed

> that different considerations apply in our review of the granting of a new trial than where such a motion has been denied. While the scope of our review is still limited, we have a greater duty here, where the trial court has to a certain extent substituted its judgment for that of the jury.

483 A.2d at 327 n. 2. A new trial may be granted where "there was a prejudicial legal error in the proceeding." *Id.* at 327. However, the trial court abuses its discretion if it "applies an incorrect standard of law or grants relief on the basis of findings of fact that are unsupported by the record." *Oxendine II,* 563 A.2d at 334 (citations omitted).

Our dissenting colleague would apply a new and more deferential standard in reviewing a case where the trial court grants a new trial based upon the erroneous conclusion that it committed a legal error during the trial. However, where it is determined that the trial court made no such error, no improper element has infected the jury's verdict which would warrant overturning it. *See Lind v. Schenley Indus., Inc.,* 278 F.2d 79, 90 (3d. Cir.1960). In *Lind,* the court explained the reason for allowing the trial court broad discretion in granting a new trial where it actually made legal error, *e.g.,* the improper admission of evidence or an improper charge to the jury. *Id.* at 90. In that circumstance

> something occurred in the course of the trial which resulted or which may have resulted in the jury receiving a distorted, incorrect, or an incomplete view of the operative facts, or some undesirable element obtruded itself into the proceedings

creating a condition whereby the giving of a just verdict was rendered difficult or impossible.

*Id.* In that instance, the trial court, by granting a new trial, may "deliver[ ] the jury from a possibly erroneous verdict arising from circumstances over which the jury has no control[,]" and the court has broad discretion in determining whether to grant a new trial in order to do so. *Id.* That is not the situation in this case where the trial court committed no error of law in the evidentiary ruling at the first trial which would result in an erroneous judgment. Therefore, the court's exercise of discretion was based upon a false premise which resulted in an abuse of discretion. *See Oxendine II, supra,* 563 A.2d at 334; *see also Johnson v. United States,* 398 A.2d 354, 365 (D.C.1979). The principle that the appellate court should be more inclined to affirm an order of a new trial based upon legal error, than when based upon a weighing of the evidence, referenced in the dissenting opinion, depends for its efficacy upon the "existence of legal error." *See Lyons, supra,* 667 A.2d at 325 n. 15; *see also Rich v. District of Columbia,* 410 A.2d 528, 536 (D.C.1979). Here, there existed no such error.

In the Memorandum and Order Granting a New Trial, the trial court concluded that appellees were entitled to a new trial because it had excluded improperly the testimony of witnesses who would have supported appellee's version of the incident. The trial court determined that in ruling on the question in the first trial, it incorrectly applied the rules of evidence and failed to consider that the responses by the witnesses to the hypothetical question which appellees sought to ask properly would have elicited "negative evidence." Hummer contends that the requisite foundation for the introduction of "negative evidence" was not laid, and therefore, the trial court erred in concluding that it was error to exclude the evidence. We agree.

The law recognizes that "negative evidence," *i.e.,* evidence tending to prove the non-existence of a fact, has some probity. *See LeCointe v. United States,* 7 App.D.C. 16, 21 (1895); *Watkins v. District of Columbia,* 60 A.2d 227, 229 (D.C.1948); *see also*

*Rogers v. United States,* 534 A.2d 928, 931 (D.C.1987). In *LeCointe,* two witnesses testified that they were present but that they did not hear the defendant make the damaging statements that the complaining witness testified that she heard. The trial court instructed the jury that the evidence of the two witnesses could not be considered in law as contradicting the complaining witness' testimony. On appeal, the court found no material error as to one of the witnesses, Ransdell, because he had no interest in the conversation between the defendant and the complainant, paid no attention to it: and had no recollection of it. However, as to the second witness, who had accompanied the complainant to see the defendant at her request and was focused on nothing else, the court held that the charge was erroneous. In explaining its ruling on the admissibility of negative evidence, the court stated

> [T]he testimony of one in a position to hear or see a thing if it had occurred, and who might, under all the circumstances, with the same degree of reason, have heard or seen it in that event, is not so strong or so satisfactory as that of one who says that he did hear it or see it. Such negative testimony is competent, however, and cannot be said to be altogether without weight as tending to contradict the positive testimony to the fact; at least, the court is not justified in so charging the jury.

*LeCointe,* 7 App.D.C. at 21.

■ Negative evidence "is admissible as some evidence of the negative inference only upon a showing that the witness so testifying was in a position to hear or see, or would have heard or seen." *Leisure Prods., Inc. v. Clifton,* 44 N.C.App. 233, 260 S.E.2d 803, 806 (1979); *see LeCointe, supra,* 7 App.D.C. at 21; *see also Fish v. Southern Pacific Co.,* 173 Or. 294, 143 P.2d 917, 922 (1944). Given the inherent infirmities in such evidence, courts view it to be

> absolutely mandatory for the witness to demonstrate that he or she was in a position to hear or see, meaning that the witness was "so situated that in the ordinary course of events he would have heard or seen the fact had it occurred. If, upon examining the surrounding circumstances

and conditions of perception of the witness, it becomes evident that the witness was not so situated, the negative testimony is meaningless."

*Leisure Prods.,* 260 S.E.2d at 806–07 (quoting *K.B. Johnson & Sons, Inc. v. Southern Ry. Co.,* 214 N.C. 484, 199 S.E. 704, 707 (1938); WIGMORE ON EVIDENCE § 664 (Chadbourn Rev.1979)). The party who seeks to rely upon negative testimony "must show the circumstances pertaining to the non-observance, the witness' activities at the time, the focus of his attention, [h]is acuity or sensitivity to the occurrence involved, his geographical location, the condition of his faculties, in short, all those physical and mental attributes bearing upon his alertness or attentiveness at the time." *Dalton's Estate v. Grand Trunk Western Ry. Co.,* 350 Mich. 479, 87 N.W.2d 145, 149 (1957); *see also Leisure Prods.,* 260 S.E.2d at 807; *Loftin v. Kubica,* 68 So.2d 390, 392 (Fla.1953). Here, the foundation was inadequate to establish that the witnesses had the requisite opportunity or vantage point to obtain accurate impressions at the critical moment.

During the first trial, appellees sought to elicit testimony from three office employees, Gabri, Strong and Mothersole, that if they had been in the room, a fact to which none of them could attest, and if the events as described by Ms. Hummer had occurred, each would have remembered the incident. Gabri was permitted to provide the testimony over Hummer's objection. When Strong stated that she had no knowledge of the event and could not say whether she was present during the procedure, the trial court did not permit her to testify further. Appellees proffered that had Strong been allowed to respond, she would have provided the same testimony as Gabri. Likewise, they proffered that they would have asked Mothersole the same question. Mothersole had no recollection of Ms. Hummer or of the incident, and she could not testify as to her presence or, if she had been present, that she would have been in a position to observe the procedure. However, Dr. Levin had testified that the possibility of Mothersole being present was slight because she was not performing dental assistant services at that time.

The trial court excluded this proffered testimony under the mistaken impression that it was habit evidence. Hummer contends that the trial court properly excluded the testimony in any event because appellees did not provide a proper foundation for its admission as negative evidence. In other words, appellees failed to demonstrate affirmatively that the attention of the witness was directed to the fact about which she would testify.

Appellees contend that although none of the dental assistants could recall being present at the time that Dr. Levin injected Ms. Hummer with lidocaine, Ms. Hummer established by her own testimony that one of them was present.[7] Although Ms. Hummer's testimony showed that an assistant was in the room during the procedure and was positioned on her left at the time that the second carpule was passed, there are critical omissions concerning the assistant's placement and, more importantly, her focus before the carpule was passed and at the time when Ms. Hummer reacted to the first injection and Dr. Levin pushed her back in the chair. Not only were the proffered witnesses unable to attest to their presence, they also were unable to provide any evidence concerning the circumstances surrounding their presence, including the focus of their attention to the

---

7. The following excerpts from Ms. Hummer's testimony are pertinent.

BY MR. BUSCEMI:

Q: Tell us what your recollection is of what happened from the beginning of this injection until it was completed.

A: I remember that when the two of us were talking, he was standing and his assistant was working behind me and there was some noise there preparing things and then he moved back [and] forth in front of me—he went—he went out and came back in once or twice.

And Dr. Levin was on my right and his assistant was on my left. He leaned me back in the chair at a—at a wide angle and had me open my mouth and I think he said something like we were going to begin now or you'll feel pinch or something like that. I don't remember exactly.

He was using both hands. He was touching me, he was in my mouth. He had one in my mouth and one outside of—he was touching me using both hands and somehow—he sort of had a grip on my face—on my jaw, if you will, with one hand and he had the needle in the other hand and he injected it and he thrust it into—jammed it into my jaw very hard.

And immediately I remember in a split second—I was starting to give my attention to him and in a split second it was in and I could just feel heat, hot—I could just feel hot liquid, burning. And it was like an electrical storm. Like an electric zap, an electrical shock. And it was burning.

And my attention went immediately to my tongue and it was just like—it was like standing on end. And the sensation, it was the most awful pain that I've ever felt.

\* \* \* \* \* \*

My body came forward. It just jerked forward and his hand and the needle were still in my mouth, were still where they were.

I don't know, that pain—maybe it was for two or four seconds where it was just so intense and then at that point my body had uprighted and the chair was still leaned back, but the whole front of my body was way up in the chair and his hand and the needle were there.

And he started to push me back with his hands and the needle while they were still in my mouth and I felt a little bit—a little reverberation, a little—like my tongue was—it wasn't pain at that point, it was like it was moving like maybe, you know, if you hit your funny bone on your elbow, how that feels, and it just sort of moves by itself and then it dissipates. That's what I was feeling. A little of that and then quickly, very quickly it became numb.

And then it all started sort of flowing together. He pushed me back in the chair and then I felt like where gravity sort of starts to take over, I just went back in the chair.

He finished the injection and I could see his assistant passing him something with a cap—a capsule. Like a capsule of anesthesia. And I had on goggles at the time, and so, I could see her hand with this little capsule in it come across me.

His hand was still in my mouth and he took the old cap off of the needle which was still there and took the new capsule and changed it while the needle was still in the tissue.

And I didn't feel pain at that time, it was more a little bit of a tugging. Like maybe my head was moved a little bit or something.

And then, he quickly injected that one, second time, this time a little slower than before. And then he took his hand out of my mouth and the needle.

BY MR. BUSCEMI:

Q: Did he say anything to you at that time?

A: Yes.

Q: What did he say?

A: He said, and I quote, "Where was the pain?" And I was feeling in shock and my attention was on my tongue and I didn't want to move it. So I think I only—so I only said two words. I said, "My tongue."

And he said, and I quote, "That's the same thing that happened to you last week." So I thought oh, okay. Then it's over now and that it was temporary.

events or their alertness to the particular situation. *See Dalton's Estate, supra,* 87 N.W.2d at 149; *Leisure Prods., supra,* 260 S.E.2d at 806–07. The testimony of Ms. Hummer, upon which appellees rely to fill the gaps in the proffered witnesses' recollections about their presence and degree of attention, discloses nothing about the focus of the assistant's attention at the critical moment when Ms. Hummer experienced the injury and the pain. In that regard, the proffered evidence is more like the witness Ransdell in *LeCointe* where the court found no material error in the court's charge to the jury that Ransdell's negative evidence could not serve to contradict the testimony of the witness who was present. Although Ransdell saw the conversation occurring, he paid no attention to it and had no recollection about it. *LeCointe, supra,* 7 App.D.C. at 20.

Thus, while there is evidence that an assistant handed the doctor a carpule after the first injection, there is no evidence about where the assistant's attention was focused before she did so.[8] Moreover, there was nothing in Ms. Hummer's testimony to indicate that she cried out or even how far she sat up before Dr. Levin forced her back down into the chair. The proffered witness and the jury would have to speculate that Ms. Hummer's reaction was sufficiently loud and demonstrative that whatever the assistant might have been doing at the moment, anyone present would have heard it or seen it. The claimed negative evidence proffered by appellees would have required each of the witnesses to speculate not only about what she would have seen and heard if she had been there to see and hear it, but also about what she would have been doing at the critical time and whether her attention was so focused on Ms. Hummer's reaction to the initial injection that she would have seen and heard it. Such speculation is not permissible.

Generally, "if it appears that the witness has no personal knowledge of the facts and the questions posed do not disclose them, he [or she] could have no reliable opinion on the subject and is incompetent to testify thereon." *Harvey's Inc. v. A.C. Elec. Co.,* 207 A.2d 660, 661 (D.C.1965); *accord, O'Neil v. Bergan,* 452 A.2d 337, 344 (D.C. 1982). Similarly, negative evidence has as its foundation for relevance and admissibility that the witness was in a position to hear or see the events which he contends did not occur. *See LeCointe, supra,* 7 App.D.C. at 21; *Leisure Prods., supra,* 260 S.E.2d at 806. Where a witness seeks to offer negative evidence, but does not know whether she was present at the time or whether she was in a position to observe all of the disputed events, her testimony about those events does not meet the foundational requirements for negative evidence and has no relevance for refuting the testimony of one who was present. *See LeCointe,* 7 App.D.C. at 21. Here, the appellees seek to have essentially all of the foundational requirements assumed. "This testimony amounts to no evidence and ... is not even negative evidence on the point in question. Disclaimers of recollection and knowledge are unsatisfactory and unacceptable substitutes for evidence." *State ex rel. and to Use of Williams v. Feld Chevrolet, Inc.,* 403 S.W.2d 672, 683 (Mo.1966). " 'The rights of persons and things ought not to rest, and the law will not permit them to depend, upon the uncertain testimony of a witness who says he did not [see],' when he was in no position to see." *Leisure Prods.,* 260 S.E.2d at 807. Therefore, the trial court's initial ruling excluding the "negative evidence" was correct.

### III.

The trial court set aside the jury's verdict in favor of Ms. Hummer in the first trial based upon an error of law in its determination that it had improperly excluded the

---

**8.** It appears that appellees also were seeking to rely on evidence of the assistants' general habits when assisting the doctor to explain what they were doing while Dr. Levin was treating Ms. Hummer on this particular occasion. This is not the type of habit evidence which would be admissible in this type of case. *See Smith v. United*

*States,* 583 A.2d 975, 981 (D.C.1990) (the threshold requirement for admission of general practice evidence is a pattern of conduct or habit sufficient to support inference of systematic conduct and to establish regular response to a repeated regular situation).

evidence.[9] Under the circumstances, we find that the trial court abused its discretion in granting a new trial. *See Oxendine II, supra,* 563 A.2d at 333; *Bell, supra,* 483 A.2d at 327. Ms. Hummer had a significant interest in not having her first jury verdict set aside. *See Bell,* 483 A.2d at 328. Therefore, we reverse the order granting a new trial, and remand to the trial court for reinstatement of the original jury verdict and vacation of the second verdict and judgment.

*So ordered.*

KING, Associate Judge, dissenting:

This case was tried twice with a plaintiff's verdict each time. The verdict in the first trial was larger than the verdict in the second trial and plaintiff understandably seeks reinstatement of the first verdict. Two trials were held because, after the first trial, the trial judge granted the defense motion for a new trial, concluding that he had incorrectly barred testimony of two defense witnesses bearing on the issue of liability. The majority holds that the trial judge abused discretion in ordering the new trial on that ground. I disagree and, therefore, respectfully dissent.

Before turning to the substantive issue on which we are divided, I will also note my disagreement with the majority on the applicable standard of review. The majority correctly observes that this court should apply an abuse of discretion standard; but, as the majority points out, "greater scrutiny" is called for by a reviewing court where the trial court has granted a new trial motion, as occurred here, than in those circumstances where the trial court has denied such a motion. *See Lyons v. Barrazotto,* 667 A.2d 314, 324 (D.C.1995). That heightened standard is the one the majority applied in this case.

The "greater scrutiny" requirement, however, is ordinarily imposed only where the grant of a new trial is grounded in the trial court's finding that the verdict is against the weight of the evidence. We have said that "[w]here the court grants a new trial because the verdict is against the clear weight of the evidence, we will scrutinize to assure that the trial court did not simply accept one version of the facts over another." *Id.* at 324–25. On the other hand, we have also said that when the grant of a new trial is based on legal error, as was the case here, "the appellate court should be more inclined to affirm the grant than when the trial court simply weighed the evidence differently than the jury." *Id.* at 325 n. 15 (internal brackets and quotation marks omitted).[1] Therefore, in reviewing the trial court's exercise of discretion in this case, the applicable standard would appear to be one falling between the two outer limits discussed above, *i.e.,* we should more closely examine the trial court's action than we would when applying the narrow standard for reviews of the denial of a new trial motion, but the standard would be less rigorous than the "greater scrutiny" required when the judge takes the verdict away from the jury. Thus, I would apply a standard of review less demanding than does the majority.

The above discussion is essentially academic in this case, however, because, even applying the majority's standard of review, I would hold that the trial judge did not abuse his discretion when he concluded that he had committed harmful error by rejecting the proffered testimony. I will not repeat the facts that have been set out in considerable detail, together with lengthy quotations from some of the witnesses' testimony, in the majority opinion. I do want to emphasize, however, the specific grounds asserted by the plaintiff on the issue of liability. The basis for liability is summarized in the order of the trial court, granting the new trial motion, where the trial court describes the testimony of the two expert witnesses called by the plaintiff:

---

9. At the second trial, the trial court (Judge Richter), following the law of the case doctrine, admitted Strong's answer to the hypothetical question excluded in the first trial. Nevertheless, the jury reached a verdict for Hummer, and the trial court denied appellees' motion for new trial or remittitur.

1. *See Rich v. District of Columbia,* 410 A.2d 528, 536 (D.C.1979); *Vander Zee v. Karabatsos,* 191 U.S.App.D.C. 200, 206, 589 F.2d 723, 729 (1978), *cert. denied,* 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1066 (1979).

Dr. Paladino testified that Dr. Levin breached the standard of care when he: (1) injected Ms. Hummer rapidly and harshly; (2) pushed Ms. Hummer back in the chair after she lunged forward; (3) removed the spent carpule and immediately injected her again without waiting for the first anesthetic to take effect; and (4) changed the carpule with the needle still in Ms. Hummer's mouth. . . .

Dr. Schiff similarly stated that Dr. Levin breached the standard of care when he: (1) rapidly penetrated the tissue; (2) did not respond to Ms. Hummer's reaction, *i.e.*, he did not withdraw the needle after Ms. Hummer experienced pain; and (3) changed the carpule while the needle remained in the tissue. . . .

Thus, according to the patient's experts, the dentist violated the standard of care in the manner in which he injected the patient while she was sitting in the dentist chair. On the question of whether anyone other than the patient or the dentist was present at that time, the patient's testimony was unequivocal: a female dental assistant was there during the entire incident, supporting the dentist. On that day, three different people, named Gabri, Strong, and Mothersole, were employed by the dentists as dental assistants, but no one remembers who was present that day, and none of the dental assistants remembered this visit of this patient.[2] The dentist testified that when dental assistants are present they must watch him because they hand him instruments. He also stated that a dental assistant would not turn her back to prepare trays, take phone calls, or make entries on the patients' charts. Finally, the patient specifically recalled that the dental assistant, who was present, handed the dentist a "capsule" while the injection was being given.[3]

Because a dental assistant was providing support to the dentist, according to the patient, then either Gabri, Strong, or Mother-sole must have been present. Therefore, the dentist sought to demonstrate that each dental assistant would have recalled an incident such as this one, if it had occurred as the patient said it did, in an effort to convince the jury that it did not in fact occur. To that end, the dentist's attorney posited a hypothetical to Gabri asking that she assume the facts as recited by the patient, and as summarized in the testimony of the plaintiff's expert witnesses noted above, which concluded with this question: "Would you remember such an event if it occurred?"[4] Over objection, Gabri responded that she would have remembered such an incident, but did not recall it happening. The trial court, however, later denied the defense the opportunity to make an identical inquiry of the other two dental assistants, Strong and Mothersole. Counsel proffered that if asked, both witnesses would have responded in the same way Gabri did. It was this ruling that the trial judge held was erroneous when he granted the motion for a new trial.

The fundamental legal principle is not in dispute. In general, the admissibility of this kind of evidence, called "negative evidence," is "founded on the witness's failure to hear or see a fact which he would supposedly have heard or seen." 2 JOHN H. WIGMORE EVIDENCE § 664 (Chadborn Rev.1979 & 1991 Supp.). This principle was long ago adopted in this jurisdiction. *See LeCointe v. United States*, 7 App.D.C. 16 (1895). The sticking point in this case, and the question that divides the parties and which separates this judge and the majority, is this limitation:

> The only requirement is that the witness should have been so situated that in the ordinary course of events he would have heard or seen the fact had it occurred.

WIGMORE, *supra*, at 907. The majority concludes that the dentist did not meet this requirement because none of the witnesses could themselves say that they were present

---

**2.** The suit was not filed until nearly three years after the incident and the trial occurred more than two years later.

**3.** The patient's testimony on this point is set out in detail in the majority opinion, *ante* at 638–39 n. 7.

**4.** The complete hypothetical question is set out in the majority opinion, *ante* at 634–35.

and in a "position to observe all of the disputed events...." *Ante* at 639. In reaching that conclusion, the majority relies upon a North Carolina case making it "absolutely mandatory for the witness to demonstrate that he or she was in a position to hear or see...." *Leisure Products, Inc. v. Clifton,* 44 N.C.App. 233, 260 S.E.2d 803, 806 (1979).

In this case, none of the prospective witnesses could meet that test. However, we have never held that the capacity of the witness to observe the events can be established only by the particular witness in question. I see no reason, for example, why that foundation could not be supplied by some other witness or witnesses. And in my view, the testimony of the patient placing a dental assistant in the room participating in the procedure, coupled with the dentist's testimony that any dental assistant present must watch him because of the necessity that she hand instruments to him (a circumstance that the patient testified occurred here) does just that. Therefore, I cannot say it would have been error for the trial court to have admitted the testimony.

The majority holds that the trial court's initial ruling excluding the evidence was correct. *Ante* at 639. While I would hold otherwise, for the reasons stated, I think it is fair to characterize that question as a fairly close one. Given that, it seems to me that the question that needs to be answered is not whether the evidentiary ruling was correct, but rather we should ask: Did the trial judge abuse discretion in granting the new trial motion upon concluding that depriving the defense of this evidence was harmful? It seems to me that the answer to that question must be "no," for two reasons. First, as stated above, the evidentiary ruling was a close one, and where a trial judge makes factual findings in determining the threshold question of admissibility of evidence, we generally give deference to those findings.[5] Second, having admitted the evidence with respect to one of the witnesses, the harm to the defendant was manifest when he was not

permitted to ask the same question of the other two witnesses. In these circumstances the jury could only have been left wondering why the dentist did not also elicit the same denial from Strong and Mothersole.

The dentist needed to complete his story by showing that all of the possible witnesses would have remembered the incident if it occurred as the patient claimed it did. The jury was, of course, free to disregard testimony setting out the dentist's version of events, but he was certainly entitled to present it in its entirety. Because he was not allowed to do so, the jury could well have concluded that the dentist did not present the other two witnesses because they would not testify as Gabri did, a conclusion contrary to reality. From the dentist's point of view, either all of the witnesses should provide the testimony sought or none of them should testify on that point. Any other result is necessarily prejudicial and a sufficient basis for the grant of a new trial. For all these reasons, I conclude that the trial court did not abuse discretion.in setting aside the verdict, on this ground, after the first trial.

---

5. *See, e.g., Laumer v. United States,* 409 A.2d 190, 203 (D.C.1979) (in reviewing the trial court's ruling on the admissibility of a declaration against penal interest, "we will not disturb the trial court's findings unless they are clearly erro-

neous"); *Watts v. Smith,* 226 A.2d 160, 163 (D.C. 1967) (same standard when reviewing trial judge's ruling on admissibility of a spontaneous utterance).