97 F.3d 1452
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Audrey M. JORDAN, Individually and as Administratrix of the
Estate of George A. Jordan, Sr., on Behalf of the
Surviving Relatives of George A. Jordan,
Sr., Plaintiff-Appellant,
v.
PACCAR, INC., d/b/a/ Kenworth Truck Company, Defendant-Appellee.
 No. 95-3478.
 United States Court of Appeals, Sixth Circuit.
 Sept. 17, 1996.
 
 On Appeal from the United States District Court for the Northern District of Ohio, No. 90-00600; Sam H. Bell, Judge.
 N.D.Ohio
 REVERSED.
 Before: MILBURN and BOGGS, Circuit Judges; and QUIST, District Judge.*
 PER CURIAM.
 
 
 1
 Audrey M. Jordan ("Jordan"), the administratrix of the estate of George A. Jordan, Sr., who was killed while driving a Kenworth truck manufactured by Paccar, Inc., is an unsuccessful products liability plaintiff. She appeals from the district court's denial of her Fed.R.Civ.P. 60(b)(3) motion for a new trial based on fraud, misrepresentation, or other misconduct by Paccar. Jordan claims that Paccar wrongfully withheld from pre-trial discovery information about prior similar litigation. We reverse the district court's order and remand for an evidentiary hearing, in light of the interpretation of Rule 60(b)(3) that we set forth below.
 
 
 2
 * We have already examined this case in a prior appeal. Jordan v. Paccar, Inc., 37 F.3d 1181 (6th Cir.1994). We take the background facts given below largely from our previous opinion.
 
 
 3
 Paccar is a Delaware corporation with its principal place of business in the State of Washington. Paccar designs, manufactures, and sells "Kenworth" tractors and trucks. Its Kenworth W900B tractor was devised with a driver's-cab roof that is distinctive because it is made of a single solid piece of fiberglass, with no steel or metal reinforcement. Virtually all Kenworth tractors have had such a roof design for at least 17 years. The predecessor to the W900B was the W900A, which had the same roof design with "somewhat different" dimensions.
 
 
 4
 George A. Jordan, Jr. purchased a Kenworth W900B tractor from a dealership in Ohio as a Christmas present for his father, George A. Jordan, Sr., a professional truck driver. In April 1988, George Jordan, Sr. was hauling 36,000 lbs. of reactivated charcoal in a van-type trailer he had loaded in Beaver Falls, Pennsylvania. Ten miles across the border into New York State, Jordan had a fatal accident as he unsuccessfully attempted to negotiate a curving off-ramp. The trailer struck a guardrail and toppled over, tearing out more than 100 feet of guardrail and a number of guardrail posts. As it twisted and swung around, the trailer pulled the tractor with it. The tractor rolled over, plummeting 29 feet. An accident expert testified at trial that the tractor hit the ground below with between 237,400 and 474,800 pounds of force. The one-piece fiberglass cab roof tore to shreds. Jordan was thrown from the vehicle and found dead, apparently from chest injuries sustained when a guardrail and a concrete parapet wall intruded into the driver's cab. Paccar maintains that the decedent would have been killed even if the cab roof had held firm throughout the accident because the force of the crash was immense, because the intrusion of objects that actually caused death came through the windshield and not the cab roof, and because the decedent's unbelted body when he was thrown from the vehicle hit the ground with great impact.
 
 
 5
 Audrey Jordan, George Jordan, Sr.'s widow, a resident of Pennsylvania, brought a diversity action under the Ohio Product Liability Law, Ohio Rev.Code Ann. §§ 2307.71-.80, claiming a defect in the design of the cab's roof. The case was tried to a jury. It found that Paccar's tractor was not defectively designed. We rejected Audrey Jordan's appeal, which raised the issue of whether the jury instructions given in the case were faulty. Jordan, 37 F.3d at 1183-85.
 
 
 6
 In discovery before trial, the plaintiff propounded interrogatories[1] to Paccar, certain of which are reproduced below:
 
 
 7
 21. Has Defendant ever been named as a defendant in any litigation in which any plaintiff alleged any of the following with respect to any of Defendant's trucks:
 
 
 8
 a. the roof or frame of the cab of the truck was not adequate to protect occupants in a roll-over situation;
 
 
 9
 b. that the truck should have been equipped with a rollbar or a roll-over protective system or structure....
 
 
 10
 23. Has Defendant ever received any notices, complaints or claims with respect to any of Defendant's trucks that asserted any of the following:
 
 
 11
 a. that the roof or frame of the cab of the truck was not adequate to protect occupants in a roll-over situation;
 
 
 12
 b. that the truck should have been equipped with a rollbar or a roll-over protective system or structure....
 
 
 13
 If Paccar had answered either of these interrogatories in the affirmative, Interrogatories Nos. 22 & 24, respectively, would have required the company to provide specific information about the "litigation," "notices, complaints or claims" described in Interrogatories Nos. 21 & 23. Paccar originally answered "No" to Interrogatories Nos. 21 & 23. Much later, however, on June 12 or 13, 1992, one of Paccar's outside counsel wrote to the plaintiff indicating that an objection should have been interposed to Interrogatories Nos. 21-24. "It is our position that the existence of other litigation is not discoverable. Without waiving the objection, there have been other 'rollover' suits filed against Kenworth." The plaintiff's attorney then wrote back on June 17, 1992, "To the extent that you desire to interpose an objection two years late, it will always be plaintiffs' position that your objections were waived long ago by your failure to file them in a timely fashion.... You state in your letter that 'There have been other rollover lawsuits filed against Kenworth.' Are there any that have not yet been disclosed to plaintiffs? If so, please let me know immediately." Paccar's outside counsel then responded in a letter dated June 18, 1992, "I cannot answer that question as I do not know what you have been told. If you will tell me the names of the cases of which you are already aware, I can answer the question." The plaintiff's attorney never responded to this letter.
 
 
 14
 Nevertheless, at some unknown time during the litigation, Paccar informed the plaintiff about nine other suits in which a "Kenworth truck was alleged to be defective as a result of a rollover accident." These nine suits and the date on which they were filed are summarized below, in chronological order:
 
 
 15
 1. Brown v. Kenworth Truck Co., Harris County, TX (12/13/79)--alleging death caused by rollover resulting from defective materials and design.
 
 
 16
 2. Sahagian v. J.T. Jenkins, Los Angeles County, CA (1/16/80)--alleging design defect causing a sudden loss of steering control resulting in injuries and damage to property.
 
 
 17
 3. Schultz v. Paccar, Inc., Fresno County, CA (7/3/80)--alleging design defect causing torsion-bar brackets to crack and break, thereby leading to a rollover.
 
 
 18
 4. Hodgdon v. Paccar, Inc., Snohomish County, WA (3/20/81)--alleging design defects relating to the steering column causing additional injuries after a rollover, but also alleging that the "cab to the chassis of the said truck-tractor was devoid of any safeguards, reinforcements, stiffening devices or rollbars" and that the "truck-tractor ... collapse[d], giving no protection to the driver-occupant."
 
 
 19
 5. Sudderth v. Kenworth Motor Truck Co., Los Angeles County, CA (3/15/84)--alleging injuries resulting from rollover caused by design defect related to torsion-bars and the fact that special dangers were present when a tanker being hauled by the Kenworth tractor was filled to capacity.
 
 
 20
 6. Scott v. Paccar, Inc., Anderson County, TX (2/19/86)--alleging bumper was defective and because of a crash the faulty bumper caused a rollover resulting in death.
 
 
 21
 7. Nasse v. Stucki, San Bernardino County, CA (10/24/86)--alleging injuries caused in an accident resulting from design and manufacturing defects of an unspecified nature (this suit was filed on a form that simply required checking boxes).
 
 
 22
 8. Ener v. Kenworth Truck Co., Harris County, TX (1986?[2] )--alleging injuries caused in a rollover accident resulting from a manufacturing defect in the front axle.
 
 
 23
 9. DuBose v. South Texas Kenworth, Inc., Guadalupe County, TX (2/25/91)--alleging rollover causing injuries resulting from defective design of the air-ride suspension system.
 
 
 24
 It is not clear from the record whether Paccar told the plaintiff about these nine lawsuits or some subset of them before or after the flurry of letters between counsel in June 1992.
 
 
 25
 One of Paccar's employees testified in a deposition that Paccar only turned over information related to lawsuits that had concluded less than seven years before the company's first attempt to retrieve the information because documents more than seven years old are destroyed pursuant to a general company policy. Contrary to later representations made to the district court in relation to the plaintiff's motion that is now the subject of this appeal, it appears that Paccar did not inform the plaintiff during discovery that summary computer records existed covering litigation for which there was no longer documentary evidence.
 
 
 26
 In any event, it is undisputed that the plaintiff was not told before trial by Paccar about one lawsuit in particular, Prewitt v. Paccar, Inc., filed September 13, 1978, in Snohomish County, Washington. The plaintiff's attorney learned about this litigation from a microfiche record in the Snohomish County court during the pendency of Jordan's appeal from the jury's verdict. It is undisputed that the Snohomish County court has destroyed its records of Prewitt. The plaintiff's counsel in Prewitt has done the same. The relevant allegations in the Prewitt case are very similar to those in the Hodgdon case (# 4, supra ) also filed in Snohomish County, and involved Paccar's Kenworth W900A tractor, the predecessor to the tractor that was being driven by George Jordan, Sr. when he was killed. The facts in the Prewitt case, however, seem to be much more in line with those in this case--the driver in Prewitt also had his chest crushed, for instance. Paccar settled the Prewitt suit for $425,000 in November 1980.
 
 
 27
 One of Paccar's engineers, Charles Van Winkle, now deceased, stated in a deposition in Prewitt that "in the event of an accident wherein a load or weight is applied to the cab of a truck, the best protection to the driver is to have the cab collapse, thereby acting as an energy absorbing enclosure and reducing the energy applied to the driver. The cab of the type truck which was involved in this accident is designed to collapse, and to absorb energy in doing so which would otherwise be applied to the driver of the truck." He also stated in his deposition that "in his opinion, roll over protection devices were not practical from a safety standpoint when dealing with trucks of the type involved in the [Prewitt ] litigation."[3] On the other hand, the plaintiff's expert witness in Prewitt, Byron Bloch, stated that "it is imperative for a motor vehicle to be designed so as to maintain the 'survival space' for the driver and passenger.... Charles P. Van Winkle ... affirmed the opposite design principles.... that it is better to have the cab collapse. Frankly, I find such a rationale to be ludicrous, for it encourages extreme intrusion into the driver's and passenger's 'survival space.' "
 
 
 28
 Jordan does her best to imply that the nondiscolosure of Prewitt was deliberate. Even putting aside Paccar's motivation, however, the plaintiff went to trial on the assumption that there were no rollover accidents like Prewitt. One of Paccar's employees stated in a deposition that he had no recollection of ever seeing any of Paccar's tractors rolling onto their roofs. Another employee testified that he had no information on how a Kenworth truck performed in a rollover onto its roof. One of Paccar's managers testified at trial that, "I never once had a customer of ours complain that our cab was inadequately designed or had any kind of fundamental design flaw that it wouldn't perform in a rollover or an accident." On the basis of Paccar's failure to disclose the existence of the Prewitt litigation in response to her interrogatories, Jordan filed a Rule 60(b)(3) motion for a new trial on the grounds of fraud, misrepresentation, or other misconduct of an adverse party.
 
 
 29
 Paccar responded that it did not withhold information about the Prewitt case out of any impermissible motive. Rather, it has a policy of destroying records relating to a lawsuit seven years after the final determination of the litigation. Summary computer records are apparently kept indefinitely, but Paccar warrants that its computer records on Prewitt only indicated that the case was about a design defect relating to the lack of a collapsible steering column (this issue was indeed a part of the plaintiff's theory of liability in Prewitt ). The record does not reflect when the nine suits that Paccar disclosed to the plaintiff were concluded. If some of the suits that were disclosed had been concluded more than seven years earlier, this would be strong evidence that Paccar was not being truthful about its seven-year document destruction policy. However, at oral argument, plaintiff's attorney conceded that this was not the case. All outward signs are that Paccar actually does have a seven-year document destruction policy.
 
 
 30
 Two issues mainly bother the plaintiff's attorney. First, Paccar did not disclose the existence of its summary computer records until after the Rule 60(b)(3) motion was filed and may not even have checked its summary computer records until this time. Second, Paccar's in-house law department, through which any interrogatories should have been routed, consists of only two attorneys. One of those attorneys personally handled the Prewitt case, although Paccar alleges that this attorney did not deal with Jordan's interrogatories. This rather disturbing information came out at oral argument only when Paccar's appellate counsel was questioned. In the words of Jordan's attorney: "I'm astonished. It's the first I've heard that there were only two attorneys in Paccar's law department. I assumed there were at least a dozen and now I think it's even more obvious that this information should have been disclosed to me."
 
 
 31
 The district court denied the plaintiff's Rule 60(b)(3) motion, accepting Paccar's factual assertion that it destroys its litigation files seven years after the conclusion of a suit. The district court held that even if misconduct on Paccar's part had occurred, the plaintiff could not show that her lack of knowledge of the Prewitt suit substantially interfered with the development of her case. Importantly, however, the district court did not inquire into a number of significant issues: (1) why the attorney(s) in Paccar's law department initially failed to comply with valid discovery requests by Jordan and needed to have its outside counsel supplement Paccar's initial answers to certain interrogatories; (2) why Paccar did not disclose the existence of its summary computer records relating to prior litigation until after Jordan's Rule 60(b)(3) motion was filed; (3) whether Paccar checked its summary computer records at the time it was formulating responses to Jordan's interrogatories; (4) if Paccar did not check its summary computer records at that time, why not; (5) since the computer records are not in evidence, what information do they actually contain; and (6) why, given the small size of Paccar's law department, did the lawyer who handled the Prewitt case not communicate to Jordan, either directly or through outside counsel, that Prewitt involved a very similar accident and theory of liability.
 
 II
 
 32
 We review the denial of a Rule 60(b) motion for abuse of discretion. Browder v. Director, Dep't of Corrections of Ill., 434 U.S. 257, 263 n. 7 (1978); Hood v. Hood, 59 F.3d 40, 42 (6th Cir.1995) (per curiam) (citing Browder ); Davis v. Jellico Community Hosp., Inc., 912 F.2d 129, 132-33 (6th Cir.1990). Because a district court will be held to have abused its discretion when it makes an erroneous interpretation of the law, Christian Schmidt Brewing Co. v. G. Heilemann Brewing Co., 753 F.2d 1354, 1356 (6th Cir.), cert. dismissed, 469 U.S. 600 (1985), abuse of discretion review in this context looks much like the bifurcated standard of review we most often apply, where conclusions of law are reviewed de novo and factual findings are reviewed for clear error. See Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 391, 401-02 (1990) (noting that with respect to factual findings the abuse of discretion and clear error standards are "indistinguishable" and holding that a reviewing court should give the Federal Rules of Civil Procedure their "plain meaning").
 
 A. What Rule 60(b)(3) Requires
 
 33
 The text of Rule 60(b)(3) provides as follows:
 
 
 34
 On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order or proceeding for the following reasons: ... (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party....
 
 
 35
 The district court did not devote much attention to construing the language of the rule, but it did analyze precedents from other circuits, such as Anderson v. Cryovac, Inc., 862 F.2d 910, 923 (1st Cir.1988). The opinions the district court relied on reject the idea that the text of Rule 60(b)(3) requires the moving party to demonstrate some purposeful "bad act" on the part of the adverse party. The language of the rule does not support such a construction, however. Fraud cannot be unintentional, and the use of the prefix "mis" in both "misrepresentation" and "misconduct" also suggests that the moving party under the rule must show that the adverse party committed a deliberate act that adversely impacted the fairness of the relevant legal proceeding question.
 
 
 36
 Surprisingly, this straightforward interpretation of the text of Rule 60(b)(3) has been rejected or overlooked by some courts. See, e.g., Anderson, 862 F.2d at 923 (" 'Misconduct' does not demand proof of nefarious intent or purpose as a prerequisite to redress.... The term can cover even accidental omissions--elsewise it would be [superfluous], because 'fraud' and 'misrepresentation' would subsume it."); United States v. One Douglas A-26B Aircraft, 662 F.2d 1372, 1374-75 n. 6 (11th Cir.1981) (to avoid redundancy, "misrepresentation" in Rule 60(b)(3) must encompass more than false statements made with the intent to deceive); Bros, Inc. v. W.E. Grace Manuf. Co., 351 F.2d 208, 211 (5th Cir.1965), cert. denied, 383 U.S. 936 (1966) (relief on the ground of "other misconduct" can be justified "whether there was evil, innocent or careless, [sic] purpose"); Sellers v. General Motors Corp., 40 Fed.R.Serv.2d 590, 1984 WL 1345 (E.D.Pa.1984) (ordering new trial under Rule 60(b)(3) even though "both sides [we]re partly to blame for the problem" and the non-moving party had construed a discovery request narrowly, but not in bad faith).
 
 
 37
 These interpretations of Rule 60(b)(3) by the First, Fifth, and Eleventh Circuits and a district court in the Third Circuit do not square with the plain meaning of the rule. Nor is it true that the rule must be given this construction under any canon of statutory interpretation. It is possible to give each operative word in Rule 60(b)(3) independent effect quite simply. "Misrepresentation" can be interpreted as an affirmative misstatement. See Platsis v. E.F. Hutton & Co., 946 F.2d 38, 41-42 (6th Cir.1991) (even an innocent misrepresentation claim must be based on an affirmative misstatement), cert. denied, 503 U.S. 984 (1992). "Fraud" can be interpreted as reaching deliberate omissions when a response is required by law or when the non-moving party has volunteered information that would be misleading without the omitted material. See O'Neal v. Burger Chef Sys., Inc., 860 F.2d 1341, 1347 (6th Cir.1988) (common law defines fraud to include certain omissions, "i.e., failure to disclose material facts when under a duty to do so"). And "other misconduct" can be interpreted to reach questionable behavior affecting the fairness of litigation other than statements or the failure to make statements. Most notably in this context, it could reach accidents that should have been avoided, for instance a reckless approach to searching one's files for discoverable material. The Anderson court even confessed that this was its greatest concern with an interpretation of Rule 60(b)(3) requiring proof of bad intent: "Accidents--at least avoidable ones--should not be immune from the reach of the rule." Anderson, 862 F.2d at 923.
 
 
 38
 Moreover, courts in cases such as Anderson have ignored the venerable canon of statutory interpretation known as noscitur a sociis--a word is known by the company it keeps. See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 115 S.Ct. 2407, 2411-13 (1995) (exploring the interplay between the noscitur a sociis canon and the canon relied on by the Anderson court that a statute should not be interpreted in such a way as to render superfluous any of its provisions). As discussed above, the primary connotation of each of the words in Rule 60(b)(3) suggests a requirement of some odious behavior on the part of the non-moving party. To interpret one of these words as permitting the moving party merely to demonstrate that the non-moving party made a non-reckless mistake is to ignore the text and context of the rule as well as the noscitur a sociis canon of statutory interpretation.
 
 
 39
 B. Implications of the Plain Meaning Approach to Rule 60(b)(3)
 
 
 40
 Obviously, the burden of proof in the Rule 60(b)(3) context must be placed on the party filing the Rule 60(b)(3) motion, because the rule could upset the finality of judgments too easily if this were not the case.[4] See V.T.A., Inc. v. Airco, Inc., 597 F.2d 220, 226 (10th Cir.1979) (Rule 60(b) must be interpreted so as not to disturb the "delicate balance between finality of judgment and justice that Rule 60(b) seeks to maintain.") We believe some courts (see supra n. 4), at least in their verbal flourishes, have overemphasized obtaining correct results in this context. Thus, we hold that the district court did not err when it construed Rule 60(b)(3) as requiring the moving party to demonstrate misbehavior of one of the three relevant kinds by clear and convincing evidence. Harre v. A.H. Robins Co., 750 F.2d 1501, 1503 (11th Cir.1985). While the text of Rule 60(b)(3) does not require a clear and convincing evidentiary standard, the imposition of such a standard balances the concerns animating Rule 60(b) relief against "[t]he interest in leaving concluded litigation in a state of repose." Mackey v. United States, 401 U.S. 667, 682 (1971) (Harlan, J., concurring in part and dissenting in part).
 
 
 41
 The other major area of controversy in Rule 60(b)(3) jurisprudence is how significant the misbehavior on the part of the non-moving party needs to be before a new trial will be afforded to the moving party. In this case, the district court concluded that Jordan would have to show that the misbehavior alleged by Jordan "substantially interfered with the conduct of her case." On the one hand, courts frequently state that the misbehavior in question must be shown to have foreclosed the moving party's full and fair preparation of his case. In re M/V Peacock, 809 F.2d 1403, 1404-05 (9th Cir.1987) (Kennedy, J.); Harre, 750 F.2d at 1503; Stridiron v. Stridiron, 698 F.2d 204, 207 (3d Cir.1983); Square Constr. v. Washington Metro. Area Transit Auth., 657 F.2d 68, 71 (4th Cir.1981); Rozier v. Ford Motor Co., 573 F.2d 1332, 1339 (5th Cir.1978).[5] On the other hand, a number of courts have held that the misbehavior in question need not be result-altering in order to be the proper subject of a Rule 60(b)(3) motion. Bunch v. United States, 680 F.2d 1271, 1283 (9th Cir.1982); Wilson v. Thompson, 638 F.2d 801, 804 (5th Cir.1981); Rozier, 573 F.2d at 1339; Seaboldt v. Pennsylvania R.R., 290 F.2d 296, 299 (3d Cir.1961). Contra Rosebud Sioux Tribe v. A & P Steel, Inc., 733 F.2d 509, 515 (8th Cir.) (movant must show that evidence, if offered in a new trial, would lead to a different verdict), cert. denied, 469 U.S. 1072 (1984). As the foregoing citations indicate, courts sometimes have espoused both propositions of law in juxtaposition. Nevertheless, the consistency between these two propositions is not immediately apparent.
 
 
 42
 The First Circuit attempted to reconcile these two conflicting lines of authority in Anderson, which holds that while the moving party need not show that the result in its case would have been different but for the misbehavior, the moving party still must demonstrate that his opportunity to present his case fully and fairly has been substantially impaired by a preponderance of the evidence. Anderson, 862 F.2d at 924-26. Anderson goes on to hold, however, that in cases where nefarious intent on the part of the non-moving party has been shown prejudice to the moving party should be presumed unless rebutted by clear and convincing evidence. Ibid. (citing Nation-Wide Check Corp. v. Forest Hills Distribs., Inc., 692 F.2d 214, 217-19 (1st Cir.1982)). So Anderson not only engages in complicated burden-shifting analysis depending on the motivations of the non-moving party, but also holds that some burdens must be supported by clear and convincing evidence, while other burdens must be supported only by a preponderance of the evidence. The reason for this procedural burden-shifting and "embellishment," a term the Anderson court used to describe its own holding, is the initial rejection of a construction of Rule 60(b)(3) that requires proof of nefarious or reckless behavior on the part of the non-moving party.
 
 
 43
 Having determined, however, that the text of the rule does require proof of questionable conduct of some sort on the part of the non-moving party, it follows that the damaging effect of the misbehavior should be presumed in all cases. Raising the bar at the initial stage of examining the conduct alleged to constitute misbehavior obviates the need to raise it at later stages by an elaborate system of burden-shifting that lacks any textual foundation in the rule. By interpreting Rule 60(b)(3) in this fashion, we avoid what turns out in practice to be a complex set of shifting presumptions, whose only purpose would be to reach the same results in individual cases that could be more easily achieved by a faithful textual exegesis of the rule. The district court seems to have followed the complicated regime for Rule 60(b)(3) analysis set out in Anderson. Doing so was legal error. The proper standard, as we have shown here, modifies the prevailing interpretation of Rule 60(b)(3) by requiring the moving party to demonstrate that the non-moving party engaged in deliberate or reckless misbehavior. On the other hand, we loosen the prevailing interpretation of the rule by dispensing with any requirement that the moving party demonstrate prejudice.
 
 
 44
 Finally, we hold that although prejudice should be presumed, once the moving party has shown by clear and convincing evidence that misbehavior falling into one or more of the three categories set out in Rule 60(b)(3) has occurred, our abiding concern with the finality of judgments leads to the conclusion that the non-moving party should be permitted to demonstrate by clear and convincing evidence that the misbehavior which occurred had no prejudicial effect on the outcome of the litigation. If the non-moving party cannot make such a showing, however, then the moving party should be granted appropriate relief.[6]
 
 
 45
 In light of our analysis of Rule 60(b)(3), we reject each of Paccar's three arguments that its withholding of information relating to the Prewitt litigation did not substantially impair the plaintiff's development of her case: (1) the foreseeability of rollover accidents was not at issue here since Paccar stipulated that rollover accidents occur; (2) VanWinkle's deposition would not have refuted Paccar's entire case; and (3) no useful area of discovery was foreclosed to the plaintiff, since VanWinkle is now dead and no copies of his deposition itself are available. As we have held, Jordan does not need to show that the presentation of her case was substantially impaired by Paccar's failure to inform her of Prewitt, once she shows that this failure resulted from the kinds of misbehavior addressed in the rule.
 
 
 46
 Moreover, although we do not need to address this subject under the framework we have established for Rule 60(b)(3) analysis, we note that Paccar's arguments that Jordan cannot demonstrate prejudice are extremely weak. First, it is obvious that any competent plaintiff's attorney would have wanted to know about the Prewitt litigation and that Prewitt was relevant to this case. See Rhodes v. Michelin Tire Corp., 542 F.Supp. 60, 62 (E.D.Ky.1982) ("With regard to the problem of similar accidents or product failures, few things could be more relevant in a product liability action than the occurrence or non-occurrence of other accidents or failures under similar circumstances.").[7] Second, Paccar's stipulation that rollover accidents occur does not help the plaintiff in showing, as would have benefitted her at trial, that the vulnerability of W900B roofs in rollover accidents was particularly foreseeable, especially given the testimony of witnesses for Paccar that, as far as they knew, similar accidents had never occurred. Third, there is more to the Prewitt litigation than the VanWinkle deposition--there was also the testimony of the plaintiff's expert in that case that designing a roof to collapse, even if this design aided in energy absorption, was an unsound thing to do. Knowing such an expert exists is obviously the first step in any attempt to use that expert to bolster one's case.
 
 
 47
 To summarize, we hold that Rule 60(b)(3) in the Sixth Circuit requires a demonstration by the moving party, supported by clear and convincing evidence, that one or more of the three kinds of misbehavior referred to in the rule occurred.[8] If the moving party can make this demonstration, then the policies behind Rule 60(b)(3) are fully implicated and the district court must order a new trial unless the non-moving party can demonstrate by clear and convincing evidence that its misbehavior had no prejudicial effect on the outcome of the litigation. "[Rule 60(b)(3) ] is aimed at judgments which were unfairly obtained, not at those which are factually incorrect." Rozier, 573 F.2d at 1339. Therefore, a showing of prejudice by the moving party is unnecessary. The resolution of this case thus depends on the factual issue of whether Jordan can make one of the three showings she needs in order to prevail under the rule by clear and convincing evidence and, if so, on whether Paccar can make the difficult showing by clear and convincing evidence that its misbehavior had no conceivable effect on the outcome of this litigation.
 
 
 48
 C. District Court's Factual Conclusion That There Was No Fraud, Misrepresentation, or Other Misconduct
 
 
 49
 On the three categories of misbehavior in Rule 60(b)(3), each is arguably or potentially relevant to this case. The district court could have found, for instance, that Paccar had lied to Jordan when it originally answered "No" to Interrogatories Nos. 21 & 23, thus implicating the category of "misrepresentation." "Fraud" could have been relevant because Paccar may have deliberately held back the Prewitt litigation, even as it turned over records of nine other cases to Jordan, depending on what representations it made when turning over the records of these nine lawsuits and on when this information was disclosed. Finally, some document retention policies may be so unreasonable as to constitute other "misconduct" that could justify granting a motion for a new trial under Rule 60(b)(3). We could not hold that because of Rule 60(b)(3) a corporation must maintain its documents indefinitely. But, a one-week document retention policy for information relating to products liability litigation would obviously constitute "other misconduct" within the meaning of Rule 60(b)(3).
 
 
 50
 On the facts of this case, we can quickly reject the possibility that the "other misconduct" category of misbehavior under Rule 60(b)(3) applies here. While some document retention policies may be unreasonable enough to constitute "other misconduct," a seven-year retention policy cannot constitute "other misconduct" within the meaning of the rule. We leave to future case development further line-drawing in relation to document retention policies and Rule 60(b)(3)'s protections against "other misconduct."
 
 
 51
 Given the facts of this case, both "fraud" and "misrepresentation" are conceivably at issue, however. For instance, consider the following conceivable explanation of the facts in this case: Paccar deliberately gave false answers to Interrogatories Nos. 21 & 23, throwing the plaintiff off a promising avenue of discovery for over two years. Then, only seven months before trial, Paccar corrected its false answer, indicating that previous litigation involving rollover accidents did exist, but interposing a baseless objection to turning over information about that litigation. The plaintiff's lawyer then requested the relevant information, although he was not highly diligent in following up his request, and, in response, Paccar's attorneys turned over information about some of the litigation, but not all of it, despite knowing that Prewitt involved a substantially similar accident and tort theory. This hypothetical explanation involves both misrepresentations (the false answers to the interrogatories) and fraud (the omission of any information about the Prewitt litigation).
 
 
 52
 Determining whether all or part of this hypothetical is true requires knowledge of facts that are not in the record. Credibility determinations must also be made--something that our court is not empowered to do. For instance, the district court did not hold any kind of hearing to determine exactly why Paccar had not turned over information in relation to Interrogatories Nos. 21 & 23 earlier. Paccar's letter of June 12, 1992 indicates only that Paccar's attorney had "found several discrepancies." How? Why did these discrepancies occur? The district court did not inquire into these matters and they are of vital importance to the determination of whether "fraud" occurred or whether any "misrepresentation[s]" were made. Having the results of these inquiries before us is indispensable for effective judicial review. Also of great importance for effective judicial review is when information about the other nine instances of litigation was turned over to the plaintiff and the reason for the delay in turning this information over in connection with Paccar's initial responses to Jordan's interrogatories. There should also have been facts in the record that would allow us to make an independent assessment of Paccar's claims that: (1) its computer records maintained only a summary of information about a case concluded for more than seven years; and (2) its computer database summarizing products liability suits referenced the Prewitt litigation only as having concerned steering wheel collapsibility. The district court erred in not inquiring into these matters. See Anderson, 862 F.2d at 930-31 (ordering remand for evidentiary hearing where a district court abused its discretion by not making "findings of fact on the very matters which inquiry could reasonably be expected to illuminate"--most notably findings of fact bearing on why defendant's attorneys had withheld information about a hydrogeologic report in a toxic tort case when the report fell squarely within the scope of one of the plaintiff's interrogatories).
 
 
 53
 We remand to the district court with instructions to hold an evidentiary hearing into the salient matters we have pointed to throughout this opinion and into any other matters that may seem pertinent in the light of the district court's further reflection and briefing by the parties. The district court apparently took many of Paccar's assertions at face value. Of course, if after the evidentiary hearing is held, the district court takes a hard look at the facts of this case and decides to credit Paccar's explanations for its behavior, we will defer to these findings as exercises of the district court's sound discretion, as long as such findings have sufficient support in the record. We also note that the district court's inquiry on remand will be aided by applying the law of this case rather than the law of other circuits.
 
 III
 
 54
 We REVERSE the district court's order denying Jordan's motion for Rule 60(b)(3) relief and REMAND for the district court, after conducting an evidentiary hearing on the relevant factual matters in dispute, to apply the legal analysis we have set forth above.
 
 
 
 *
 The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation
 
 
 [1]
 These interrogatories were never formally filed, although they were answered by the defendant nonetheless. The plaintiff's attorney, however, warrants that these interrogatories were served on Paccar on December 3, 1990
 
 
 [2]
 There is no date of filing provided, but the complaint is labeled case number "86-21057."
 
 
 [3]
 In both of the quotations from Van Winkle, the words given are not exactly those of Van Winkle; they are paraphrasings by Paccar's counsel in the Prewitt litigation, contained in documents in Prewitt filed with the Superior Court of Washington for Snohomish County
 
 
 [4]
 The Rule 60(b)(3) cases contain many statements rejecting concerns about finality: "We believe truth is more important than the trouble it takes to get it." Great Coastal Exp., Inc. v. International Bhd. of Teamsters, 675 F.2d 1349, 1355 (4th Cir.1982) (quoting Publicker v. Shallcross, 106 F.2d 949, 952 (3d Cir.1939), cert. denied, 308 U.S. 624 (1940)), cert. denied, 459 U.S. 1128 (1983). Or "the fairness and integrity of the fact-finding process is of greater concern" than "the important consideration of finality of judgments." Schultz v. Butcher, 24 F.3d 626, 630-31 (4th Cir.1994). Arguably, however, spending $1,000,000 in process costs to obtain a correct judgment in a matter where $100,000 is at stake is wasteful and puts the judicial system in ill-repute, to say nothing of the ongoing strife costs accompanying litigation that are finally eliminated when the litigation's result, right or wrong, is reached. We believe that the fairness of the fact-finding process and the interest in obtaining correct results in litigation must be balanced against the costs of invoking the judicial process
 We recognize, of course, that none of the subsections of Rule 60(b) affect the finality of judgments for the purposes of appellate jurisdiction. Browder, 434 U.S. at 263 n. 7. We are speaking here only of finality of judgments in the broader sense of the conclusive resolution of a legal dispute.
 
 
 [5]
 Toledo Scale Co. v. Computing Scale Co., 261 U.S. 399, 421 (1923) seems to be the source of the requirement that fraud must have foreclosed a party attempting to upset a final judgment from the "full and fair" presentation of its case. Toledo Scale was decided before the Federal Rules of Civil Procedure were enacted into law, however. For instance, while the Supreme Court did not rest its holding on this fact, the litigants in Toledo Scale, were making arguments based on the distinction between extrinsic and intrinsic fraud. This distinction was explicitly repudiated in Rule 60(b)(3)
 
 
 [6]
 In legal terms, the best case that can be made for imposing a requirement that Rule 60(b)(3) movants demonstrate prejudice is based on the harmless error rule, Fed.R.Civ.P. 61. This argument is not persuasive, however. The operative words of Rule 61 are "error" and "defect"--only if "errors" or "defects" are harmless, will they be ignored by a reviewing court when disposing of an appeal. These words do not, when interpreted according to their plain meaning, however, apply to deliberate misbehavior by any actor in the judicial process, including a litigant. Once a deliberate act violative of Rule 60(b)(3) has been committed by a litigant, for instance, the fairness of the litigation process itself is called into question and it does not make sense to require the adverse party to take the risk that it will be unable to establish prejudice when that deliberate act is uncovered. In short, we hold that the harmless error rule is inapplicable to the analysis of Rule 60(b)(3) misbehavior. Contra Anderson, 862 F.2d at 924. The policy concerns behind harmless error analysis persist, however. This is why we have imposed some limits on a moving party's ability to obtain relief under Rule 60(b)(3), once misbehavior by the non-moving party within the meaning of the rule has been demonstrated
 
 
 [7]
 We recognize, however, that the existence of the Prewitt litigation is not the shocking revelation that Jordan imagines. Prewitt may have concerned the previous accident most similar to Jordan's that we are aware of, but it seems to us that the Hodgdon case, which was disclosed, was also somewhat similar to the instant case. Prewitt does not seem to have been entirely sui generis
 
 
 [8]
 Paccar argues that the evidence of which Jordan complains she was deprived is impeachment evidence, and that such evidence cannot justify the grant of the Rule 60(b)(3) motion. In addition to holding that information withheld in discovery in violation of Rule 60(b)(3) must be result-altering, Rosebud Sioux Tribe, 733 F.2d at 516, draws a distinction between withheld impeachment evidence and other types of withheld evidence. In our view, this distinction is not defensible. Any withheld evidence falling within Rule 60(b)(3)'s three categories implicates the rule, whether the withheld evidence would have been used to impeach a witness or not. Rosebud Sioux Tribe 's suggestion to the contrary is not persuasive. Moreover, we note that on its particular facts, Rosebud Sioux Tribe ordered a new trial where the evidence that was withheld could certainly have been used to impeach the non-moving party's principal witness